**OREGON NATURAL RESOURCES COUNCIL ACTION, et al., Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE and Bureau of Land Management, Defendants,**

and

**Lone Rock Timber Co., Seneca Sawmill Company, Freres Lumber Co., Inc., and Hampton Tree Farms, Inc., Defendant–Intervenors.**

No. C98–942WD.

United States District Court, W.D. Washington, at Seattle.

Aug. 2, 1999.

Corrie Johnson Yackulic, Schroeter, Goldmark & Bender, Seattle, WA, Michael D Axline, Eugene, OR, for plaintiffs.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Edward A Boling, U.S. Dept of Justice, Gen. Litigation Sec., Environment Div., Washington, DC, for defendants.

Mark C. Rutzick, Portland, OR, for defendant–intervenors.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

DWYER, District Judge.

### I. INTRODUCTION

This is a suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, for judicial review of federal administrative

agency action. The plaintiffs, fourteen nonprofit environmental organizations in Washington, Oregon, and California, seek declaratory and injunctive relief against the United States Forest Service and the Bureau of Land Management ("BLM") in regard to the management of certain federal forests. Plaintiffs claim that the federal defendants have violated the Northwest Forest Plan adopted in 1994, and hence have violated applicable statutes, by authorizing timber sales without first conducting surveys for certain species of wildlife. They contend also that the agencies are required by law to produce a supplemental environmental impact statement ("SEIS") before approving any more timber sales. The federal defendants deny these claims. The defendant-intervenors, who are the high bidders on eight proposed timber sales that could be affected by the outcome, support the federal defendants' position.

The case is the latest in a series concerning management of the federal forests within the geographic range of the northern spotted owl. In 1991, following "a remarkable series of violations of the environmental laws," an injunction was entered in this district deferring further timber sales by the Forest Service until a lawful management plan was adopted. *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081, 1089–96 (W.D.Wash.1991), *aff'd*, 952 F.2d 297 (9th Cir.1991). In a separate case, for similar reasons, the BLM was enjoined in the District of Oregon from making further timber sales in spotted owl habitat pending completion of an SEIS. *See Portland Audubon Soc'y v. Lujan*, 795 F.Supp. 1489 (D.Or.1992), *aff'd sub nom.,*

*Portland Audubon Society v. Babbit*, 998 F.2d 705 (9th Cir.1993).[1]

In response to these and other decisions, the Forest Service and BLM worked together, for the first time, to revise the plans for managing the national forests and BLM districts within the range of the spotted owl. The process is summarized in *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, 1303–05 (W.D.Wash.1994), *aff'd sub nom., Seattle Audubon Society v. Moseley*, 80 F.3d 1401 (9th Cir.1996). As stated in that decision:

> The FSEIS and ROD are the result of a massive effort by the executive branch of the federal government to meet the legal and scientific needs of forest management. They reflect unprecedented thoroughness in doing this complex and difficult job.

*Id.* at 1303.

An interagency task force published and received comments from the public on both a draft and a final SEIS ("FSEIS"). The environmental impact statements considered ten options that allowed varying levels of logging on the federal lands. The Secretaries of Agriculture and Interior issued a record of decision ("ROD") on April 13, 1994, selecting the ninth option, thereby adopting a regional forest plan and amending the planning documents for two Forest Service regions, nineteen national forests, and seven BLM districts. *Id.*

Against numerous challenges, the plan was upheld as lawful by this court and, on appeal, by the Ninth Circuit. *See Lyons*, 871 F.Supp. at 1291; *Moseley*, 80 F.3d at 1401. Now, bringing two sets of claims

---

1. The National Forest Management Act ("NFMA") requires that the national forests be managed so as to "provide for diversity of plant and animal communities...," 16 U.S.C. § 1604(g)(3)(B) (Supp.1999), and "to maintain viable populations of existing native and desired nonnative vertebrate species in the planning area." 36 C.F.R. § 219.19 (1999). Although not every species can be systematically observed, "indicator species" such as the spotted owl must be monitored as signs of general wildlife viability. *Seattle Audubon*

*Soc'y v. Evans*, 771 F.Supp. at 1083; 36 C.F.R. § 219.19. Similarly, the Federal Land Policy and Management Act ("FLPMA") requires that BLM lands be managed "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. §§ 1701(a)(8) (Supp.1999). Land use plans must "give priority to the designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c) (Supp.1999).

under the APA, plaintiffs contend that the federal defendants have not lawfully implemented the plan. The applicable statutes require that timber sales be consistent with land management plans. *See* NFMA, 16 U.S.C. § 1604(i) (Supp.1999), and 36 C.F.R. § 219.10(e) (1999); FLPMA, 43 U.S.C. § 1732(a) (Supp.1999), and 43 C.F.R. § 1610.5–3 (1999). A plan such as the ROD can be amended only through certain procedures which have not been followed here. *See* 16 U.S.C. § 1604(d); 43 U.S.C. § 1712(a) (Supp.1999); 36 C.F.R. § 219.10; 43 C.F.R. §§ 1610.2–1610.4 (1999).

The first set of claims challenges certain interpretive memoranda regarding the ROD's wildlife survey requirements, and defendants' reliance on those memoranda in approving timber sales without conducting surveys. The plan sets aside certain reserves and requires that known sites of certain rare species be protected. But for many species, surveys are the principal means of ensuring that their viability will not be ended by logging. By requiring surveys for those species before ground-disturbing activities that are implemented after September 30, 1996, or September 30, 1998, depending on the species, the plan allows measures to be taken to protect any sites that are found. The federal defendants issued and later updated memoranda stating that timber sales were exempt from these survey requirements if environmental impact statements had been completed before the applicable cut-off dates, even if ground-disturbing activities had not yet commenced. They also issued memoranda that established a survey protocol for the red tree vole, which is a primary source of food for the spotted owl. Under the protocol, site-specific surveys need not be done in areas of abundant red tree vole habitat or in habitat that is isolated in watersheds owned primarily by non-federal parties. Plaintiffs contend that these memoranda unlawfully exempt many timber sales from the plan's survey requirements, and therefore violate NFMA, 16 U.S.C. §§ 1600–1687 (Supp.1999), and FLPMA, 43 U.S.C. §§ 1701–1785 (Supp.

1999), pursuant to which the plan was established.

In the second set of claims, plaintiffs allege that because significant new information has come to light since the plan was adopted, the federal defendants are required by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370d (Supp.1999), and its implementing regulations, 40 C.F.R. § 1502.9(c) (1999), to issue an SEIS.

Denying these contentions, the federal defendants assert that the agencies' interpretations of the survey requirements are reasonable and entitled to deference, and that there is no obligation to prepare a new region-wide SEIS because the plan is flexible enough to accommodate any new information that has arisen. The defendant-intervenors concur, and contend also that plaintiffs lack standing.

All parties have moved for summary judgment under Fed.R.Civ.P. 56. The motions have been fully briefed and oral argument was heard in open court on July 1, 1999. Following argument, the parties submitted supplemental briefs on the standing issue, the last filing having been received on July 22, 1999. All parties agree that no genuine issue of material fact exists for trial and that the case can be decided on the motions for summary judgment. The federal defendants have asked for a further hearing on the scope of injunctive relief, if any, if the court rules in favor of plaintiffs. The court has jurisdiction under 28 U.S.C. § 1331 (Supp.1999) and under the APA, 5 U.S.C. § 706 (Supp. 1999).

## II. STANDING, RIPENESS, AND FINAL AGENCY ACTION

Defendant-intervenors contend that plaintiffs lack standing to challenge the federal defendants' approval of timber sales based on disputed interpretations of the plan's survey requirements. The doctrine of standing involves limitations on jurisdiction derived from both constitutional and prudential sources. *See Bennett v.*

*Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

■ To establish standing under Article III of the United States Constitution, plaintiffs must show: "(1) the invasion of a legally-protected interest; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood that the court can redress the injury by a favorable decision." *See Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1094 (9th Cir.1998) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Churchill County v. Babbitt*, 150 F.3d 1072, 1077 (9th Cir.1998).

■ Under the APA, parties "adversely affected or aggrieved by an agency action within the meaning of a relevant statute" may seek judicial review thereof. 5 U.S.C. § 702; *see also Federal Election Commission v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 1783, 141 L.Ed.2d 10 (1998) (the word "aggrieved" shows congressional intent to "cast the standing net broadly"). NFMA requires that timber sales be consistent with forest and resource management plans, 16 U.S.C. § 1604(i), and FLPMA requires that the BLM manage lands pursuant to land use plans. 43 U.S.C. § 1732(a). The plan requires defendants to survey before implementing ground-disturbing activities. ROD at C–5. The declarations filed by plaintiffs' members show that they use the areas impacted by the challenged sales for viewing, studying, and enjoying the biological diversity of the forest, including species listed in the survey requirements. The interests of these members are threatened by the prospect that logging will go forward without legally required measures being taken to protect native species. *See Florida Key Deer v. Stickney*, 864 F.Supp. 1222, 1224 (S.D.Fla. 1994) ("the desire to use or observe an animal species, even for purely aesthetic purposes, is a cognizable interest for purposes of standing" (citations omitted)). Plaintiffs thus have a procedural right under the APA to protect their interests. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1500–01 (9th Cir.1995) (a procedural right to protect a concrete interest is necessary to establish procedural standing), *cert. denied*, 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996). The "legally protected interest" requirement is met.

There is also a causal relationship between the alleged procedural injury and the threatened concrete interest. Plaintiffs' claims are "procedural" insofar as they "seek[ ] 'to enforce a procedural requirement the disregard of which could impair [plaintiffs'] concrete interest.'" *Churchill County*, 150 F.3d at 1077 (quoting *Defenders of Wildlife*, 504 U.S. at 572, 112 S.Ct. 2130). Accordingly, plaintiffs must show that there is a "reasonable probability" that the challenged action threatens their concrete interest. *Id.* at 1078 (citation omitted). "[T]hreatened harm to 'health, recreational use, and enjoyment' ... constitutes an impairment of a concrete interest." *Oregon Natural Desert Ass'n*, 172 F.3d at 1094 (quoting *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir.1994)). Plaintiffs have shown that their members use and enjoy the areas designated for the nine timber sales. The Northwest Forest Plan, because of the threat to species viability, requires that surveys be done before ground-disturbing activities are implemented. If forest areas are logged without knowledge of the number and location of critical species, permanent harm to species, and thus to plaintiffs' interests, may result.

Finally, plaintiffs' alleged procedural injuries are redressable in this action. "[P]laintiffs need not demonstrate that the ultimate outcome following proper procedures will benefit them." *Oregon Natural Desert Ass'n*, 172 F.3d at 1094 (citing *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir.1992)).

■ To establish prudential standing under the APA, plaintiffs must assert an interest within the "zone of interests" of

the statutes in question. *Bennett*, 520 U.S. at 163, 117 S.Ct. 1154 (citing *Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)); *see also, Churchill County*, 150 F.3d at 1078; *Soler v. Scott*, 942 F.2d 597, 605 (9th Cir.1991), *vacated on other grounds*, 506 U.S. 969, 113 S.Ct. 454, 121 L.Ed.2d 364 (1992) (stating that the zone of interests test "is not meant to be especially demanding"). Courts should look to the "substantive provisions of the [statute], the alleged violations of which serve as the gravamen of the complaint." *Bennett*, 520 U.S. at 175, 117 S.Ct. 1154. The interest plaintiffs seek to vindicate must have a "plausible relationship to the policies" underlying the statute. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 403, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

■ The plaintiffs are environmental organizations seeking to protect their members' rights to use and enjoy the forests that defendants manage. The forest plan and the statutes under which it was promulgated are intended, in part, to preserve such rights. The "zone of interests" test for prudential standing is satisfied.

■ Standing exists for the reasons stated, but the requirements of ripeness and final agency action must be separately considered. In support of earlier motions to dismiss under Fed.R.Civ.P. 12(c), the federal defendants and defendant-intervenors argued that plaintiffs' claims failed to satisfy the final agency action requirement of 5 U.S.C. § 704 and were not ripe for review under *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998). *See* Dkt. # 56. These arguments have not been raised in the motions for summary judgment, and it is clear that the finality and ripeness requirements are satisfied. For the reasons stated in the previous order (Dkt.# 56), plaintiffs' NEPA claims are ripe for review under 5 U.S.C. § 706(1), which has been characterized as "an exception to the final agency action requirement." *See Oregon Natural Resources Council Action v. BLM*, 150 F.3d 1132,

1137 (9th Cir.1998). The federal defendants' decisions to authorize timber sales without conducting surveys are "final agency action[s]" for purposes of 5 U.S.C. § 704 (1998). *See Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997) (stating that agency action is considered final if it is "the consummation of the agency's decisionmaking process" and "one by which rights or obligations have been determined, or from which legal consequences will flow"). Because specific timber sales are challenged in the second amended complaint, the claims are ripe. *See Ohio Forestry*, 118 S.Ct. at 1670; *see also Sierra Club v. Martin*, 168 F.3d 1, 6 (11th Cir.1999) (holding that plaintiff was "entitled to challenge the Forest Service's compliance with the [forest] Plan as part of its site-specific challenge to the timber sales").

## III. STANDARD OF REVIEW

■ Plaintiffs' claims relating to defendants' implementation of the survey requirements are reviewed under § 706(2)(A) of the APA, which directs the court to set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see also Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 981–82 (9th Cir. 1985). Substantial deference is afforded to an agency's interpretations of its own regulations, *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), and agency action is presumptively valid. *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.1976). But the court should not defer to an agency interpretation that contradicts the plain language of a regulation. *Thomas Jefferson University*, 512 U.S. at 512, 114 S.Ct. 2381.

■ The focal point for judicial review is the administrative record in existence, not a new record made initially in the reviewing court. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir.1980). Evi-

dence outside the record may be considered for certain limited purposes, e.g., to explain the agency's action or to determine whether its course of inquiry was inadequate. *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir.1988); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988).

The federal defendants request that certain declarations filed by plaintiffs be disregarded. In substance this is a motion to strike. The motion is denied; these declarations, and those filed by the federal defendants, are properly considered for the limited purposes mentioned above.

## IV. CLAIMS REGARDING THE SURVEY REQUIREMENTS

The Secretaries of Agriculture and Interior, in promulgating the ROD, said that it would "provide the highest sustainable timber levels from Forest Service and BLM lands of all action alternatives that are likely to satisfy the requirements of existing statutes and policies." ROD at 61. This meant, as noted in the decision upholding the ROD's legality, that "any more logging sales than the plan contemplates would probably violate the laws." *Lyons*, 871 F.Supp. at 1300. The plan and voluminous studies and reports that led to it recognized the marginal state of certain wildlife species in the federal forests, and made clear that careful monitoring would be vital. The FSEIS stated:

> Monitoring is an essential component of natural resource management because it

provides information on the relative success of management strategies.

FSEIS at 2–10.

The decision in *Lyons* emphasized the importance of this:

> [T]here is no doubt that excessive logging and development have brought the spotted owl, and other species sharing its habitat, to a perilous point.

> \*   \*   \*   \*   \*   \*

> Careful monitoring will be needed to assure that the plan, as implemented, maintains owl viability. New information may require that timber sales be ended or curtailed.

> \*   \*   \*   \*   \*   \*

> Monitoring is central to the plan's validity. If it is not funded, or not done for any reason, the plan will have to be reconsidered.

871 F.Supp. at 1321, 1324.

### A. The Category Two Survey Requirements

The ROD identifies more than 400 "at risk" species. ROD at C–49–61 (Table C–3). It sets out four levels of survey and management requirements.[2] Known sites of rare species are to be protected by barring logging on a certain number of surrounding acres. ROD at C–4. For 77 species markedly at risk from the continued harvest of old growth and late-successional forests, the plan requires that surveys be conducted before ground-disturbing activities are carried out.[3] Plaintiffs challenge the manner in which the

2. The "survey and management" requirements are listed in descending order of priority. Under category one, known locations of certain species must be managed. Under category two, surveys must be conducted for rare species at risk from continued logging activities before ground-disturbing activities are implemented; any sites found must be appropriately managed. Category three surveys are required for species "whose characteristics make site and time-specific surveys difficult;" these surveys do not have to be completed before ground-disturbing activities are started. Category four surveys are general regional surveys intended to identify and

obtain more information about various species to determine necessary levels of protection. ROD at C–4–5.

3. Six of these species are vertebrates: five salamanders and the red tree vole. The other seventy-one include rare polypores, leafy and nitrogen-fixing lichens, certain bryophytes, and numerous species of mollusks and vascular plants. The lynx originally was included as a category two species but later was reclassified into category three and thus is no longer subject to the category two survey requirements.

federal defendants have implemented these "category two" survey and manage requirements.

The plan states that "[e]fforts to design protocols and implement [category two] surveys should be started immediately. Where surveys are completed, the information gathered from them should be used to establish managed sites for species . . . [and] management standards will be developed to manage habitat for the species on sites where they are located." The category two survey requirement is implemented in two stages. First, within the known or suspected ranges of five salamander species and the red tree vole, "surveys . . . must precede the design of all ground-disturbing activities that will be implemented in 1997 or later." For the other 71 category two species, "development of survey protocols . . . must begin in 1994 and proceed as soon as possible. These surveys must be completed prior to ground-disturbing activities that will be implemented in F.Y.1999 or later."

Although the plan states that the category two surveys must be done if "ground-disturbing activities . . . will be implemented" after certain dates, the federal defendants issued interpretive memoranda equating issuance of an environmental impact statement with the "implementation" of ground-disturbing activities. The result is to exempt numerous proposed sales from the survey requirements. A November 1, 1997, memorandum issued jointly by the Forest Service and BLM stated that "[t]he interagency interpretation is that the 'NEPA decision equals implemented'." [4] Thus, for the first six category two species, for "[p]rojects with NEPA decisions signed prior to October 1, 1996, and contracts offered before January 1, 1997— no survey is required." A September 1, 1998, memorandum extended this interpretation to the survey requirements for the remaining 71 category two species, concluding that surveys need not be done for any timber sale for which an environmental impact statement was completed before October 1, 1998. The record shows that Forest Service and BLM managers uniformly relied on these memoranda in deciding not to require category two surveys before approving the nine timber sales challenged here, even though ground-disturbing activities have yet to begin on any of those sales.[5]

4. In this context, "NEPA decision" refers to the environmental impact statement or finding of no significant impact ("FONSI") that must be produced before a timber sale is authorized.

5. In approving the Christy Basin timber sale, the Forest Service stated that the category two survey requirements were inapplicable because "[t]he interagency letter of November 1, 1996, states that 'the specific direction in S & G on page C-5 [of the ROD] will be used.... The interagency interpretation that NEPA decision equals implemented' is in context to Component 2 species survey requirements. The Christy Basin Record of Decision was signed on September 3, 1998, thus the project was implemented before FY 1999." Christy Basin AR at 61.

When the Beegum Corral Regan timber sale was approved, the Forest Service simply stated that surveys were not required because this is an activity implementing a Regional Guide decision previously made. Beegum Corral Regan AR at 8.

For the Skull Thin timber sale it was explained that "[because] the Decision Notice

. . . for Skull Thin was signed on September 28, 1998, implementation in regards to this standard and guideline, occurred in fiscal year 1998, not fiscal year 1999. The survey requirement found on ROD C-5 . . . did not apply to Skull Thin for those 71 species cited." Skull Thin AR at 10.

The documents approving the Gold Wind Timber sale concluded that no surveys are necessary for red tree voles based on BLM Instruction Memorandum OR-97-009, and that "no surveys for Component 2 species are required" under the general interpretive memoranda because "[t]he Notice of Sale, which is the official decision document implementing these sales, was . . . [completed] on May 27, 1998." Gold Wind AR at 15.

The North Murphy timber sale was upheld on appeal because the Board of Land Appeals decided to defer to the interpretation of "implemented" promulgated by Instruction Memorandum No. OR-97-007. North Murphy AR at 4. No surveys were required for the red tree vole based on "Instruction Memorandum OR-97-009," id. at 6, and no category two surveys were required because "[t]he first Notice of Sale, which is the official decision

■ These actions by the federal defendants are arbitrary and contrary to the plain language of the ROD. The plan requires that surveys for five salamander species and the red tree vole "precede the design of all ground-disturbing activities that will be implemented" on October 1, 1996, or later. Surveys for other category two species "must be completed prior to ground-disturbing activities that will be implemented" on October 1, 1998, or later. In both instances, "implemented" refers to ground-disturbing activities. Indeed, the title of the category two survey requirements is *"Survey prior to ground-disturbing activities."* There is no mention of NEPA decisions. Environmental impact statements often precede ground-breaking activities by a number of years. To equate the NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the plan's survey requirements. It would also create an incentive to rush NEPA decisions to avoid conducting surveys; of the nine timber sales being challenged here, four received a final NEPA decision in September 1998, the last month before the survey requirements were to apply under the defendants' memoranda.[6]

Defendants argue that their interpretation is reasonable and entitled to deference because the plan gives them "a maximum of four full fiscal years (FYs 1995, 1996, 1997, and 1998) in which to develop and apply survey protocols for these species." But that "maximum" is a ceiling, not a floor, and is consistent with the specific, phased-in requirements stating that surveys must be conducted prior to ground-disturbing activities being implemented after fiscal years 1996 and 1998.

Far from being minor or technical violations, widespread exemptions from the survey requirements would undermine the management strategy on which the ROD depends. The surveys are designed to identify and locate species; if they are not done before logging starts, plants and animals listed in the ROD will face a potentially fatal loss of protection. The plan itself recognized the importance of site-specific analysis:

> This record of decision does not provide final authorization for any timber sale, nor does it compel that any timber sale be awarded. Rather, the decision amends various Forest Service and BLM planning documents; timber sales offered subsequent to the effective date of this Record of Decision must be consistent with these planning documents. In addition, timber sales must undergo appropriate site-specific analysis, and must comply with applicable regulatory

document implementing this sale, was published on April 2, 1998." *Id.* at 9.

The Bear timber sale also was found to comply with the survey requirements for the red tree vole: "The 1997 red tree vole (RTV) analysis done on the Mt. Hood National Forest followed the direction in the November 4, 1996 FS–Memorandum and the BLM–Instruction Memorandum No. OR–97.... [S]ince the fifth-field watersheds these sales fall within contain adequate RTV habitat, no actual on-ground surveys were conducted on these timber sales for the RTV." Bear AR at 10.

The Class of '98 timber sale was found to be exempt from category two survey requirements because the sale decision was signed on September 21, 1998, and "[i]n matter of the interpretation of the ROD, regarding implementation, the IBLA has ruled on this question as recently as November 20, 1998,

interpreting the intent of 'implemented', as found in the NFP (ROD, p. 37), to mean 'designed' or 'authorized.' " Class of '98 AR at 8 (citing *In re North Murphy Timber Sale,* 146 IBLA 305 (1998)).

Finally, in regard to the Sweet Pea timber sale, no category two surveys were required because the "decision to award this sale was signed on September 21, 1998," and therefore under the interpretive memoranda no surveys were required. Sweet Pea AR at 4.

6. The Christy Basin Record of Decision was signed on September 3, 1998. Christy Basin AR at 61. The Sugar Pine and Sweet Pea offers of sale were signed on September 21, 1998. Sugar Pine AR at 7; Sweet Pea AR at 4. The Skull Thin decision was signed on September 28, 1998, only two days before the survey requirements were to apply. Skull Thin AR at 10.

requirements for public participation and administrative appeal.

ROD at 13.

The ROD's category two survey requirements are clear, plain, and unmistakable. For the salamanders and red tree voles, surveys must be completed prior to the design of ground-breaking activities to be implemented on or after October 1, 1996. For other category two species, surveys must precede ground-disturbing activities implemented on or after October 1, 1998. For any timber sales in which ground-disturbing activities did not commence by those dates, the surveys must be done. Agency actions exempting timber sales from the plan's category two survey requirements by equating "implemented" with "NEPA decision" are unlawful and must be set aside under the APA, 5 U.S.C. § 706(2)(A).[7]

## B. The Survey Protocol for the Red Tree Vole

■ In addition to the general memoranda discussed above, the federal defendants issued specific guidance with regard to the red tree vole. A November 4, 1996, memorandum issued jointly by the Forest Service and BLM, entitled "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole," eliminates the requirement that surveys be conducted in a number of areas. First, "[i]n those watersheds where less than 10 percent of the land is under management and there is no direct dispersal connection to BLM or Forest Service lands in other watersheds, neither site-specific surveys nor management of red tree voles is required." In other areas, whether surveys are required is determined by habitat conditions. In watersheds with large amounts of suitable

red tree vole habitat, no surveys are to be done. If "a minimum of 40 percent of the federal land in the fifth-field watershed is forested and (a) has approximately 60 percent crown closure or greater, and (b) has an average conifer tree diameter at breast height of approximately 10 inches or greater, and (c) this closure and diameter can be maintained through the end of the decade," there are to be no red tree vole surveys. Only in watersheds that do not meet the threshold habitat criteria are surveys required. This guidance was initially intended to "apply for a short term, estimated to be one-to-two years" because the team that drafted the protocol "recognized that there were additional risks associated with not requiring site-specific surveys in all areas." But a September 25, 1998, memorandum extended its applicability through September 30, 1999. The net result is to exempt about ninety percent of the red tree voles' habitat, including all of its California habitat, from the survey requirements.

Defendants argue that the protocol is reasonable because where habitat is abundant management of particular red tree vole sites is not necessary, and where populations already are isolated, with no potential for the creation of connective corridors, trying to protect the voles would be futile. Stating that site-specific surveys were adding little to scientific knowledge, and that the risk to species viability from foregoing surveys would be small, the red tree vole memorandum concludes that "field surveys are not needed" in widespread areas. There has been no attempt to amend the ROD to reflect this change.

The decision not to conduct red tree vole surveys in areas where habitat is abundant

---

**7.** The Eleventh Circuit recently reached a similar conclusion with respect to survey requirements in the forest plan for the Chattahoochee National Forest in Georgia:

Since the agency's position is contrary to the clear language of the Plan and the statute, it is not entitled to deference. We consequently hold that the Forest Service's failure to gather population inventory data

on the PETS species occurring or with a high potential to occur within the project areas is contrary to the Forest Plan and, therefore, that the decision to approve the timber sales without considering this information is arbitrary and capricious.

*Sierra Club v. Martin,* 168 F.3d 1, 5 (11th Cir.1999).

or isolated has no basis in law. The ROD gives the Forest Service and BLM the discretion to conduct surveys "at a scale most appropriate to the species" (ROD at C–5), but does not allow the agencies to forgo surveys altogether, or to exempt broad areas from the requirements.[8] The plan contemplates that for most species surveys would begin at the watershed level "with identification of likely species locations based on habitat." Then, *"those likely locations would . . . be thoroughly searched prior to implementation of activities."* ROD at C–5 (emphasis added). As to the red tree vole in particular, the plan requires that surveys be conducted within the species' *"known or suspected ranges and within the habitat types or vegetation communities associated with" it. Id.* (emphasis added). The protocol adopted by the defendants does exactly the opposite. It determines where red tree voles are most likely to be found, identifying its "known or suspected ranges," "habitat types," and "vegetation communities," and then exempts those areas from the survey requirements. The plan's requirement that surveys be conducted cannot be dropped simply by the issuance of memoranda concluding that "field surveys are not needed."

## V.  NEPA CLAIM

▮▮▮▮ An agency's failure to prepare an SEIS is reviewed under § 706(1) of the APA, which requires the court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

To prevail, plaintiffs must show that defendants have refused to prepare an SEIS despite a clear legal duty to do so. *See ONRC Action v. Bureau of Land Management,* 150 F.3d 1132, 1137 (9th Cir.1998). An SEIS is required if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). A decision not to prepare an SEIS is entitled to deference and cannot be set aside unless it was arbitrary and capricious. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

Plaintiffs identify five alleged events that they argue constitute significant new information triggering the requirement to prepare a region-wide SEIS: first, defendants have allowed timber sales to go through without conducting the required category two surveys; second, fish populations have declined; third, water quality is worse than expected; fourth, the Canadian lynx has been found within the range of the northern spotted owl; and fifth, higher than expected levels of old-growth reserves have been harvested and unplanned-for timber sales have occurred because they were mandated by Congress in the 1995 Rescissions Act, Pub.L. 104–19. Defendants dispute the accuracy or significance of these allegations, and contend that they are responding appropriately to

8. The plan states that "within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for . . . red tree voles . . . must precede the design of all ground-disturbing activities that will be implemented in [fiscal year] 1997 or later." ROD at C–5. This provides explicit instruction as to where red tree vole surveys must be conducted. The plan goes on to state that surveys for the other 71 category two species should "proceed as soon as possible." *Id.* "These surveys must be completed prior to ground-disturbing activities that will be implemented in F.Y.1999 or later." *Id.* (emphasis added). Here, the use of the term "these surveys" clearly refers to surveys for the other 71 category two species, not to surveys for red tree voles. Five lines later, in the same paragraph, the term "these surveys" is used again: *"These surveys* may be conducted at a scale most appropriate to the species." Thus, read in context, the provision granting discretion to determine the scale of surveys seems to refer only to surveys for the other 71 category two species, not to those for red tree voles. Nevertheless, the use of the term "these surveys" is ambiguous. Accordingly, deference must be afforded to the agencies' reasonable interpretation. *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

any new information. Careful consideration of the record shows that plaintiffs have cited no new information that cannot be addressed under the existing plan.

The first change cited by plaintiffs—that defendants have authorized timber sales without complying with the category two survey requirements—is largely mooted by the holding in part III of this order. The claims regarding certain fish and the declining water quality of streams relates not to new data but to changes in legal status under the Endangered Species Act and under § 303(d) of the Clean Water Act; while these listings are important, they do not in themselves require a new SEIS. As to the Canadian lynx, defendants have shown that they are responding appropriately to any new information: they have completed a scientific report, drafted a conservation strategy, and are considering but have not yet decided whether an SEIS will be necessary. Finally, defendants dispute plaintiffs' contention that harvest of timber within reserves has been higher than predicted. The plan requires that harvests within reserves be for silvicultural or salvage purposes, and the FSEIS on which the ROD was based assumed that as much as 100 to 170 million board feet per year might come from the reserves. The harvest amounts shown in the record have been within that expectation.

The ROD anticipated that new information affecting forest management within the range of the northern spotted owl would arise, and it provides mechanisms by which decisionmakers may respond. The survey and manage requirements presume that new information will be discovered regarding the location and populations of certain species, and state that with respect to category two species "[w]here surveys are completed, the information gathered from them should be used to establish managed sites for species."

On a broader level, the forest plan adopts an "adaptive management" strategy, defined as

a continuing process of action-based planning, monitoring, researching, evaluating and adjusting with the objective of improving the implementation and achieving the goals of [the ROD] .... To be successful, it must have the flexibility to adapt and respond to new information. Under the concept of adaptive management, new information will be evaluated and a decision will be made whether to make adjustments or changes.

ROD at E–12.

The plan's adaptive management approach is adequate to deal with any new information plaintiffs have identified. If circumstances warrant, the ROD gives the Forest Service and BLM the flexibility to reduce or halt logging in order to comply with their statutory mandates. *See Lyons,* 871 F.Supp. at 1321 ("New information may require that timber sales be ended or curtailed."). But they are not required to conduct a new SEIS at this point. *See, e.g., Enos v. Marsh,* 769 F.2d 1363, 1373–74 (9th Cir.1985) (upholding decision not to conduct SEIS despite nearly fifty percent increase in size of project). If the wildlife survey requirements were abolished or substantially weakened, the outcome under NEPA might be different.

A claim under § 706(1) of the APA is "in essence" one for mandamus under 28 U.S.C. § 1361. *Independence Mining Co., Inc. v. Babbitt,* 105 F.3d 502 (9th Cir.1997). Plaintiffs must show that defendants' duty to act "is ministerial and so plainly prescribed as to be free from doubt ...." *Oregon Natural Resources Council v. Harrell,* 52 F.3d 1499, 1508 (9th Cir.1995) (internal quotations and citation omitted). On the present record, plaintiffs have not carried their burden to compel the preparation of a new region-wide SEIS.

## VI. CONCLUSION

For the reasons stated, plaintiffs' motion for summary judgment is granted as to the claims regarding defendants' failure to implement the ROD's survey requirements,

and defendants' and defendant-intervenors' motions as to those claims are denied. The defendants' administrative actions to authorize timber sales on the basis of memoranda that would vitiate the survey requirements are declared to be unlawful. As to the NEPA claim, plaintiffs' motion for summary judgment is denied, and defendants' and defendant-intervenors' motions for summary judgment are granted.

Defendants' request for a separate hearing regarding injunctive relief is granted. Defendants' and defendant-intervenors' briefs on that subject will be due on August 10, 1999; plaintiffs' responding brief on August 17, and any replies by August 24, 1999. Defendants and defendant-intervenors will each have twelve pages (including opening briefs and replies); plaintiffs will have twelve pages. Decision is reserved as to whether the hearing will be evidentiary or will be limited to oral argument.

Pending further order of the court, the preliminary injunction issued on July 26, 1999, as to the North Murphy and Bear sales, will continue in effect. The preliminary injunction is hereby expanded to include the other seven sales identified in the amended complaint—i.e., the Christy Basin, Beegum Corral Regan, Skull Thin, Gold Wind, North Murphy, Bear, Class of '98, Sugar Pine, and Sweet Pea sales— and to require that the defendants provide to the court and all counsel at least ten days' advance written notice of any decision to award timber sales that have been administratively appealed by one or more plaintiffs and have been identified by plaintiffs based on claims presented in the amended complaint.

The clerk is directed to send copies of this order to all counsel of record.