Chad HANSON, et al., Plaintiffs,

v.

UNITED STATES FOREST SERVICE
and Bureau of Land Management,
Defendants,

and

American Forest Resource Council,
Defendant–Intervenor.

No. C99–1050L.

United States District Court,
W.D. Washington,
at Seattle.

April 5, 2001.

John S Karpinski, Vancouver, Rachel M Fazio, John Muir Project, Pasadena, CA, for Chad Hanson, an individual, Native Forest Council, an Oregon non-profit, Earth Island Institute, a California non-profit, Friends of the Breitenbush Cascades, on Oregon non-profit, plaintiffs.

Brian C Kipnis, U S Attorney's Office, Seattle, John W Watts, U S Department of Justice, Environment and Natural, Resources Div, General Litigation Section, Edward A Boling, John Patrick Almeida, U.S. Dept of Justice, Gen. Litigation Sec.—Environment Div., Washington, DC, for U.S. Forest Service, Bureau of Land Management, defendants.

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

LASNIK, District Judge.

### I. INTRODUCTION

This is a suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, for judicial review of federal administrative agency action. The plaintiffs, Chad Hanson, Native Forest Council, Earth Island Institute, and Friends of the Breitenbush Cascades (collectively "citizen groups"), seek injunctive relief against federal defendants United States Forest Service and

Bureau of Land Management (collectively "the Forest Service"), until a Supplemental Environmental Impact Statement ("SEIS") on the 1994 Northwest Forest Plan ("Plan") is prepared. The citizen groups assert that the Forest Service is required to comply with the National Environmental Policy Act ("NEPA") by submitting an SEIS before awarding any new timber sales or implementing existing timber sales. The Forest Service denies these claims. Defendant-intervenor American Forest Resource Council ("AFRC") supports the Forest Service's position.

The citizen groups contend that the Forest Service is required by NEPA, 42 U.S.C. § 4321 et seq., to issue an SEIS because three pieces of significant new information have come to light since the Plan was adopted. The Forest Service asserts that the citizen groups' claims are not ripe. It also contends that it considered the information cited by the citizen groups and did not find it to be new and significant. AFRC concurs, and contends that the citizen groups lack standing and bring no new and significant information to light that cannot be addressed under the existing Plan.

All three parties have moved for summary judgment under Fed.R.Civ.P. 56. The motions have been fully briefed and oral argument was heard in open court on February 7, 2001. All parties agree that no genuine issue of material fact exists for trial and that the case can be decided on motions for summary judgment. For the reasons stated in this Order, the Court finds that the Forest Service has complied with NEPA and that it need not take further action under the statute. The citizen groups' request for injunctive relief pending the completion of an SEIS is denied.

## II. STANDING, RIPENESS, AND FINAL AGENCY ACTION

AFRC argues that the citizen groups lack standing to challenge the Forest Service's approval of timber sales because the declarations from their members are too vague to constitute a personal and concrete injury. The citizen groups argue that standing has been established by submitting declarations from their members, professing a past, present, and future use of the forests.

■ The doctrine of standing has constitutional and prudential origins. To establish constitutional standing, a plaintiff must demonstrate an injury in fact, a causal connection between the injury and defendant's conduct, and a likelihood that the court can redress the injury by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "[E]nvironmental and aesthetic injuries constitute injuries in fact for standing purposes." *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176 (9th Cir.2000).

■ Through their declarations, the citizen groups allege that their members utilize various forests within the Plan for hiking, climbing, backpacking, swimming, nature study, and other outdoor activities. (*See* Decl. of Chad Hanson at ¶¶ 3, 7; Decl. of Heather Weinstein at ¶ 5; Decl. of Tim Hermach at ¶¶ 5–6; Decl. of Michael Donnelly at ¶¶ 4–5; Decl. of Mark Ottendad at ¶ 4). They express concern that the logging of the old-growth forests, which provide shelter to the northern spotted owls ("NSOs"), harms the species and the beauty of the forests they frequent. The citizen groups have established that their environmental and aesthetic interests in the Plan's forests will be harmed by future logging. If their request for an SEIS and injunctive relief were granted, the articulated injury would be redressed.

The citizen groups have constitutional standing.

■ To establish prudential standing under the APA, the citizen groups must demonstrate that they are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. They must also establish that they are within the "zone of interests" of the statute at issue, which is not intended to be a difficult standard. *ONRC v. USFS*, 59 F.Supp.2d 1085, 1089–90 (W.D.Wa.1999).

The citizen groups believe their enjoyment of the forests will be adversely affected if an SEIS is not conducted under NEPA to take into account new and significant information regarding the NSOs and logging. The zone of interests test is not burdensome, and it is satisfied. The citizen groups have prudential standing.

Standing exists but the issues of ripeness and final agency action must be considered before the Court can reach the merits of this case. The Forest Service argues that the citizen groups' action is not ripe for judicial review because it does not challenge a final agency action at the project level and does not oppose site-specific timber sales. The citizen groups assert that a NEPA action is ripe, regardless of whether a final agency action has been authorized or implemented. Alternatively, they argue that the Forest Service's failure to prepare an SEIS in light of new information is a final agency action. The citizen groups contend that they need not challenge a specific site-specific timber sale project because their grievance is with the overall Plan.

■ Under the APA, when general review is sought of an agency action, it must be a final agency action. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695

(1990). However, the Supreme Court recently explained that a NEPA claim may be ripe before a final agency action because it "simply guarantees a particular procedure, not a particular result." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). The Court stated, "Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* Recently, the Ninth Circuit interpreted *Ohio Forestry* as creating an exception to the final agency action requirement for NEPA. *See ONRC v. BLM*, 150 F.3d 1132, 1137 (9th Cir. 1998); *ONRC v. USFS*, 59 F.Supp.2d 1085, 1090 (W.D.Wash.1999).

The law is unclear as to whether the citizen groups must make a site-specific grievance or may challenge the entire Plan. The Supreme Court in *Ohio Forestry* was not persuaded by Sierra Club's assertion that it wanted to mount one legal challenge against the Plan in lieu of filing several site-specific challenges to logging decisions. *See* 523 U.S. at 734–35, 118 S.Ct. 1665. The Ninth Circuit has stated that *Ohio Forestry* "calls into doubt a plaintiff's ability to challenge an agency's adoption of a plan without site-specific actions as the focus of the challenge." *See ONRC v. BLM*, 150 F.3d at 1136. The Seventh Circuit, however, has held that plaintiffs challenging NEPA compliance "need not wait to challenge a specific project when their grievance is with an overall plan." *Heartwood, Inc. v. USFS*, 230 F.3d 947, 953 (7th Cir.2000) (internal citation omitted).

■ The citizen groups are correct that a final agency action need not have occurred, because the Supreme Court and the Ninth Circuit have held that NEPA is an exception to the final agency action rule

and is ripe at the time the alleged failure to act occurs. As for whether their grievance must be site-specific or may be with the entire plan, the Court finds that both parties have reasonable arguments. However, the Court agrees with the Seventh Circuit in *Heartwood* that a plaintiff may object to an entire plan. Because NEPA requires a procedure rather than a specific result, there is no need to wait for site-specific decisions. The claims are ripe for judicial review.

### III. STANDARD OF REVIEW

■ An agency's decision as to whether new information requires an SEIS is reviewed under the arbitrary or capricious standard. *See* 5 U.S.C. § 706(2)(a); *Marsh v. ONRC*, 490 U.S. 360, 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). "The standard is narrow and presumes the agency action is valid." *Seattle Audubon Society v. Moseley*, 798 F.Supp. 1473, 1476 (W.D.Wash.1992). When conflicting views are presented, the agency has the discretion to rely upon the reasonable opinions of its own experts. *See Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1177 (9th Cir. 1990). The court's role is to review the administrative record and to ensure the agency made a reasoned decision based upon its evaluation of the new information. *See id.*

### IV. MOTIONS TO STRIKE

■ As a preliminary matter, AFRC moves to strike the declarations of Drs. Leonard Broberg and Gordon Orians, submitted in support of the citizen groups' motion for summary judgment. Materials outside of the administrative record may be considered for limited purposes, such as "to explain the agency's action or to determine whether its course of inquiry was insufficient or inadequate." *Seattle Audubon Society*, 798 F.Supp. at 1477 (*citing*

*Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir.1988)). Drs. Broberg and Orians are not experts on the NSO, but their testimonies predominantly relate to avian population dynamics. The Court will consider their testimony in that limited capacity. AFRC's motion to strike is denied.

The citizen groups move to strike the declarations of Joseph Lint and Elaine Rybak, submitted in support of the Forest Service's motion for summary judgment. If the Lint and Rybak declarations were not considered, then there would be no available information on logging. The citizen groups do not know how much timber has been logged. The planning documents contain predictions, not realistic statistics regarding logging. It would be circular reasoning to require an SEIS to obtain this information because new information is necessary to warrant the preparation of an SEIS. The motion to strike the Lint and Rybak declarations is denied.

### V. MOTIONS FOR SUMMARY JUDGMENT

An agency's failure to prepare an SEIS is reviewed under § 706 of the APA, which requires the court to compel agency action that has been unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. § 706(1). An SEIS is required if there is significant and new information relevant to environmental concerns that relates to the proposed action or its impact. *See* 40 C.F.R. § 1502.9(c).

The citizen groups assert that the Forest Service's failure to prepare an SEIS is a failure to act. They argue that an SEIS must be conducted because there are three new and significant pieces of information: (1) a 1999 Demographics Report on the rate of decline of the NSO population; (2) the amount of late-successional/old-growth forest ("LSOG") acres being logged exceeds the guidelines of the Plan; and (3)

the "No Surprises" Rule adopted by the United States Fish and Wildlife Services ("FWS") in 1998 impacts the NSOs on non-federal lands. They allege that an SEIS must be prepared because the Plan adopted in 1994 is in need of revision. The Forest Service and AFRC contend that none of the information is new and significant, and if it were, it could be addressed by the adaptive management approach of the existing Plan.

## A. 1999 Demographics Report [1]

The citizen groups state that the Plan predicted that the NSO population would decline at a rate of less than 1% per year. They contend that the 1999 Demographics Report contains new and significant information that the NSO population is decreasing at the rapid annual rate of 3.9%.[2] They take an inconsistent position in their reply brief to AFRC and contend that even if there is a slight improvement in the NSO population, an SEIS must be prepared to assess such information.

The Forest Service contends that the 1999 Demographic Report is consistent with the Plan's expectations.[3] AFRC argues that the 1994 Final SEIS ("1994 FSEIS") predicted the NSO population

would decline at an annual rate of 4.5%.[4] The 3.9% figure in the 1999 Demographics Report reveals that NSOs are actually declining at a slower than anticipated rate. The Forest Service and AFRC contend that the 1999 Demographics Report was considered and the determination was made that it did not contain new and significant information. They contend that their decision to not produce an SEIS was not a failure to act. The Forest Service submits the declaration of Eric Forsman, a member of the team that came up with the alternative that was adopted by the Plan. Forsman explains that when the 3.9% estimate of population decline is given a 95% confidence level, the annual rate of decline falls somewhere between 0.3% and 7.5% (3.9% plus or minus 3.6%), which overlaps the 1% suggested by the citizen groups. *See* Decl. of Eric Forsman at ¶ 8. Therefore, Forsman alleges that it is hard to state with certainty that rate of decline is greater than the 1% suggested by the citizen groups.

The citizen groups point to Appendix J3 of the 1994 FSEIS to support their assertion that NSOs were expected to decline at an annual rate of 1%. Appendix J3 includes a paper entitled, "A Simulation Analysis of

1. *See* Administrative Record Document ("AR Doc.") 19 at 42 ("Range–Wide Status and Trends in the Northern Spotted Owl Populations," produced by the Forest Service and by other agencies and entities, dated April 12, 1999).

2. The citizen groups suggest that the actual decline of the NSO population could be more dramatic than 3.9% because of the decline in females and non-juvenile survival. They submit the declarations of Dr. Leonard Broberg and Dr. Gordon Orians as expert testimony. Dr. Broberg states that the rate of decline could be higher than 3.9%. *See* Decl. of Dr. Leonard Broberg at ¶¶ 11–12. Dr. Orians states that the decline of owls in certain states is higher than the 3.9% average. *See* Decl. of Dr. Gordon Orians at ¶ 11. When it becomes

a battle of experts, the Court defers to the Forest Service's discretion to rely upon the data of its own experts. Therefore, the Court will not consider the argument that the NSO population is decreasing at a faster rate than 3.9%.

3. *See* AR Doc. 18 at Nos. 3 & 11 ("Northern Spotted Owl Demographic Analysis–Range–Wide Status and Trends, Questions and Answers," dated May 3, 1999).

4. *See* AR Doc. 26 at 3 & 4–233 ("Final Supplemental Environmental Impact Statement on Management of Habitat for Late–Successional and Old–Growth Forest Related Species Within the Range of the Northern Spotted Owl").

Population Dynamics of the Northern Spotted Owl in Relation to Forest Management Alternatives."[5] The authors of the paper developed a computer simulation model and created three sets of rules. The authors state that Rule Set 2 was the most likely scenario. The citizen groups contend that Rule Set 2 predicted an annual decline of less than 1%. The authors warn the readers not to use the study for forecasting because it is untested: "Results of this analysis do not purport to represent actual population trends ... There are simply too many unknowns to be confident that any model will predict the actual population of a species many decades in the future."[6] The authors also state that their simulation "must be considered conservative" because they did not model the growth of the habitat within reserves over time or the habitat conditions on non-federal lands.[7]

■ The Court agrees with the Forest Service that the Plan predicted an annual NSO population decline of 4.5%, and the 1999 Demographic Report estimate of 3.9% is consistent with such an estimate. The citizen groups' reliance on a simulation analysis that states it should not be utilized to predict population trends is misplaced. They cite to Figures 7A–7D of the paper, but the Court finds no evidence of a 1% annual decline estimate in those figures. The paper is not officially part of the 1994 FSEIS, states its estimates are conservative, and states it should not be used for predicting population trends. The Court does not find the 1999 Demo-graphic Report to contain new and significant information.

## B. *Logging*

The citizen groups assert that the Forest Service's documents indicate that the logging of acres is more than two times the amount predicted by the Plan. They further assert that the Forest Service's reports indicate that over 90% of the timber comes from LSOGs.[8] The citizen groups therefore infer that over 90% of the LSOGs are being logged, which is over 40,000 acres per year, more than twice the limit allowed under the Plan. They allege that the exact amount of annual owl habitat loss due to the logging of LSOGs is unknown because the Forest Service does not maintain such data.

The Forest Service argues that the citizen groups' data is incorrect. AFRC argues that the assumption that owl habitat loss is equated with acres harvested is incorrect. AFRC explains that while 90% of the timber may come from LSOGs, that does not mean that 90% of all acres logged are LSOG. The Forest Service estimates that approximately 57,480 acres of owl habitat have been logged since 1994. *See* Decl. of Joseph Lint at ¶ 3 (22,980 acres of habitat, plus or minus 3,000 acres, have been removed); Decl. of Elaine Rybak at ¶ 3 (34,500 acres of habitat removed). The declarations of Lint and Rybak explain that their information regarding LSOG logging was gathered from the different Plan areas and BLM field offices. The

---

**5.** *See* AR Doc. 262.

**6.** The report also states:

The predictive power of the model is untested (and fundamentally not testable, at least in the short term.) .... Actual prediction of population levels during a transition period is extremely unlikely to be reliable—even if the model were perfect—because these lev-els are very dependent on the start-up populations and estimates of current population are still fairly crude. *Id.* at 7–8.

**7.** *Id.* at 8.

**8.** *See* AR. Doc. 259 at 293–94 ("Draft Supplemental Environmental Impact Statement," dated December 1999).

Forest Service maintains that it monitors the timber programs, and that the alleged failure to monitor logging is not reviewable.

■■ The Plan guidelines limit the logging of LSOGs to 20,000 acres per year. The estimation that 57,480 acres of LSOG has been logged is well within the 100,000 acre limit for the five year span (1994–1999). The Court must defer to the Forest Service's reliance on the expert testimony of Joseph Lint and Elaine Rybak. The Court agrees with AFRC's explanation that percentages of the timber harvested and LSOGs logged are not necessarily equivalent. The record demonstrates that the Forest Service has been monitoring the Plan.[9] The Court does not find the citizen groups' estimates of LSOGs logged to be correct or to constitute new and significant information.

### C. *"No Surprises" Rule*

The "No Surprises" Rule was promulgated by the FWS in 1998. It encourages non-federal landowners to develop Habitat Conservation Plans (HCPs) and provides them assurances that they will not be required to take additional measures in the future. However, the FWS may revoke a permit when it is the only available alternative to protect an endangered species from extinction. *See* 64 Fed.Reg. 32706, 32709.

The citizen groups argue that the No Surprises Rule has resulted in the vast proliferation of HCPs and will result in unanticipated NSO habitat losses on non-federal lands. They rely on a report on the effects of HCPs that was produced by American Lands Alliance, entitled "Exam-

ples of Fish and Wildlife Conservation Needs on Non–Federal; Forestlands and Species Harmed by HCPs." The report purportedly identifies twelve HCPs that will allow the take of 550 known pairs of owls and the loss of 118,757 acres of suitable owl habitat on non-federal lands.

The Forest Service maintains that the only assumption made by the Plan was that HCPs and non-federal lands would be managed consistent with the Endangered Species Act ("ESA"). The Forest Service did not expect non-federal lands to contribute to NSO conservation efforts.[10] It asserts that the citizen groups provide no explanation of which HCPs have resulted in a loss of habitat, what non-federal land has been removed, and what activities have occurred. It contends that the citizen groups mischaracterize a "take" because HCPs are not a take within the meaning of the ESA. AFRC asserts that the application of the No Surprises Rule to NSOs is speculative because the citizen groups have not alleged that anything has occurred to the NSOs since the rule's adoption.

■■ The citizen groups argue that some sort of unspecified harm may occur to the NSOs in the future because of the No Surprises Rule. This claim is speculative. Even if the citizen groups were able to allege with specificity that the removal of suitable owl habitat has occurred in HCPs, that does not mean that an illegal "take" of NSOs has occurred. Under the ESA, a "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The FWS has defined "harm" as an act that actually kills or injures wildlife by "significantly impairing essential behavior

---

**9.** *See* AR Docs. 5–7 (Implementation Monitoring Reports); AR Doc. 27 at Appendix I (Monitoring and Evaluation Plan).

**10.** *See* AR Doc. 26 at 3 & 4–6.

patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. The ESA's prohibition of a take does not apply to situations in which a permit has been issued to authorize an incidental take of a listed species. 16 U.S.C. § 1539(a)(1)(B). Thus, even if incidental takes were to occur on HCPs, this would not be in violation of the ESA. If NSOs were in jeopardy of extinction, the No Surprises Rule allows the permit to be revoked. The citizen groups' speculation as to what may or may not occur to NSOs and their habitat does not establish new and significant information.

The citizen groups have not demonstrated that the three pieces of information are new and significant, warranting an SEIS be prepared for the Plan. They have not shown that such information, if deemed relevant, could not be addressed by the process of adaptive management. The Forest Service has demonstrated that it reasonably relied upon its own expertise in their determination to not prepare an SEIS. That decision was not arbitrary or capricious. Accordingly, the citizen groups' requests for an SEIS and for an injunction is denied.

## VI. CONCLUSION

For the foregoing reasons, the citizen groups' motion for summary judgment and request for injunctive relief is DENIED. The Forest Service's and AFRC's motions for summary judgment are GRANTED. The Clerk of the Court is directed to send copies of this Order to all counsel of record.