**SCOTT TIMBER, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 05–708C.

United States Court of Federal Claims.

Feb. 27, 2009.

Gary G. Stevens, Saltman & Stevens, P.C., Washington, D.C., for plaintiff. With him at trial and on the briefs were Ruth G. Tiger and Eric J. Pohler, Saltman & Stevens, P.C., Washington, D.C.

Joan Stentiford Swyers, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. With her at trial and on the briefs was Ellen M. Lynch, Trial Attorney, Commercial Litigation Branch, and with her on the briefs were Gregory G. Katsas, Acting Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. Of counsel were Marcus R. Wah, Rebecca Harrison, and Ben Hartman, Office of the General Counsel, U.S. Department of Agriculture, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This is a post-trial decision on liability in a timber-sale case.[1] The relevant timber-sale contracts pertained to the "Jigsaw," "Whitebird," and "Pigout" timber areas located in the Umpqua National Forest in Southern Oregon, within Region 6 of the National Forest System. Stip. ¶ 1.[2] On June 30, 2005,

---

1. By order entered March 22, 2006, the trial was bifurcated into separate phases addressing liability and damages. Docket No. 15 (Mar. 22, 2006).

2. The parties jointly stipulated to certain facts and the Joint Stipulation will be cited as "Stip. ¶ ——." Citations to the trial transcript are to "Tr. ——" and those to the transcript of the closing argument are to "Cl. Tr. ——." Plaintiff's exhib-

Scott Timber Company ("Scott Timber") filed suit in this court alleging that the United States Forest Service ("Forest Service") had wrongfully suspended and breached these three timber-sale contracts. Compl. ¶ 4. Scott Timber seeks damages, interest, costs, and attorney's fees based on the alleged breaches of contract. Compl. at Prayer for Relief, ¶¶ c-e.

An eight-day trial on liability was held in Portland, Oregon from June 30 through July 11, 2008. After post-trial briefing and closing argument, the liability issues are ready for disposition.

## FACTS

### A. Scott Timber's Sale Contracts

The Forest Service advertised the sale of timber on the Pigout, Jigsaw, and Whitebird timber-sale areas, solicited bids for timber-sale contracts, and held oral auctions on October 21 and 28, 1998. See JX 1 at SCOTT–03834 (Pigout Timber Sale Advertisement), JX 2 at SCOTT–09274 (Jigsaw Timber Sale Advertisement), JX 3 at SCOTT–11141 (Whitebird Timber Sale Advertisement). Prior to opening each oral auction, the Forest Service's contracting officer, Brenda Woodard, caused her assistant to read a notice informing all bidders that the Forest Service was involved in litigation and that the award might be delayed. See Tr. 650:19 to 651:2 (Test. of Michael Bormuth, a timber cruiser and appraiser for Scott Timber), 870:14 to 871:18 (Test. of Brenda Woodard), 1083:22 to 1084:12 (Test. of Robert Devlin, Director of Natural Resources for Region 6 of the Forest Service); PX 71 at A–424 (E-mail from Devlin (Oct. 16, 1998)) (describing the standard announcement made before the bid opening to inform prospective bidders "that the sale is currently under litigation and [that the] award may be delayed").

Scott Timber was the high bidder for each of the three contracts. Tr. 969:15–17 (Woodard). However, the contracts were not awarded promptly—rather, no action was

its are denoted as "PX——," defendant's exhibits are identified as "DX——" and joint exhibits are represented as "JX——."

taken for over eight months, a period that dated from October 1998 to June 1999. See PX 119 at SCOTT–00111 (Mem. from Susan Zike, regional litigation coordinator and Freedom of Information Act coordinator for Region 6 of the Forest Service to Woodard) (Apr. 23, 1999) (advising that the contracts should not be awarded "until mid-June"), PX 129 at A–993 to A–994 (Mem. from Zike) (July 7, 1999) (noting that the three contract awards were "delayed until after [the] ONRC hearing [on] 7/1/99"); Tr. 463:25 to 464:6, 466:1–12 (Test. of Zike), Tr. 908:15–23, 909:9–15 (Woodard).[3] During this hiatus following the final bidding, Peter Quast, a representative of Scott Timber, periodically and regularly called the Forest Service's Contracting Officer to check on the status of the potential contracts. See Tr. 931:19–20, 951:24 to 952:15 (Woodard). During these conversations, Scott Timber was never told about any specific pending litigation. See Tr. 912:5–15, 936:11 to 937:12, 951:24 to 952:15 (Woodard); see also Tr. 658:1–10 (Bormuth). The final award of the contracts was made by the Forest Service on July 8, 1999. Stip. ¶¶ 2–4; JX 6 at SCOTT–10876 (Award Letter for Jigsaw Timber Sale), JX 7 at SCOTT–11534 (Award Letter and Change of Termination Date for Whitebird Timber Sale), JX 8 at SCOTT–06387 (Award Letter for Pigout Timber Sale).

Each of the three contracts contained Section CT6.01, which provided for the interruption or delay of operations to prevent environmental damage or to comply with a court order:

> Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

> (a) To prevent serious environmental degradation or resource damage that may require contract modification under CT8.3 or termination pursuant to CT8.2;

**3.** The reasons why, in the view of the Forest Service, the litigation styled Oregon Natural Resource Council Action v. United States Forest Service, No. C98–942WD (W.D.Wash.), was relevant to the delay are addressed infra, at 5–8.

(b) *To comply with a court order, issued by a court of competent jurisdiction;* or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (i) Contract Term Adjustment pursuant to BT8.21, or (ii) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

JX 4 at SCOTT–10011 (Whitebird Timber Sale Contract), JX 5 at SCOTT–03935 to 36 (Pigout Timber Sale Contract); DX 63 at SCOTT–09487 (Jigsaw Timber Sale Contract) (emphasis added). Each contract also contained Section BT8.21, which permitted a Contract Term Adjustment if the purchaser experienced an interruption or delay in operations or if the Forest Service requested an interruption or delay of more than ten days:

BT8.21 Contract Term Adjustment. "Contract Term Adjustment" means adjustment only as provided immediately above *[i.e.,* extended in writing] and for the three circumstances described in this Subsection. Under said circumstances, the contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost, except as limited by (b) below.

. . . Lost portions of days shall be disregarded in computing time lost. The three circumstances qualifying for a Contract Term Adjustment are:

(a) *Purchaser experiences delay in starting scheduled operations or interruptions in active operations either of which stops removal of Included Timber* from Sale Area through curtailment in felling and bucking, yarding, skidding and loading, hauling or road construction, as scheduled under BT6.31, *for 10 or more consecutive calendar days during a Normal Operating Season* due to causes beyond Purchaser's control, including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.

(b) Causes described in (a) substantially affect the disposition or processing of Included Timber during Normal Operating Season through their effects on primary timber processing facilities, with a resulting delay of 60 calendar days or more in use of such facilities. In such event, Contract Term Adjustment shall not extend for more than 12 consecutive months.

(c) *Purchaser (i) accepts Forest Service written request to interrupt or delay operations for any purpose other than suspension under BT4.4 or BT9.3* or (ii) suffers an interruption or delay of [p]urchaser's Operations affecting skidding, yarding and loading because of fire emergency closure ordered by Forest Service (or another agency in its behalf), and the total of such lost time is 10 or more calendar days during any Normal Operating Season.

JX 4 at SCOTT–09977 (Whitebird Timber Sale Contract), JX 5 at SCOTT–03904 (Pigout Timber Sale Contract); DX 63 at SCOTT–09455 (Jigsaw Timber Sale Contract) (emphasis added).

The three contracts were suspended due to an injunction issued by the United States District Court for the Western District of Washington in *Oregon Natural Resources Council Action v. United States Forest Service,* 59 F.Supp.2d 1085 (W.D.Wash.1999) (*"ONRC Action"*). The Forest Service notified Scott Timber of the suspension of these timber sales by letter on August 31, 1999. Stip. ¶ 7; DX 35 at SCOTT–0411 (Mem. from Woodard to Scott Timber (Aug. 31, 1999)). The Pigout contract remained suspended until June 11, 2002, Stip. ¶ 8, and the Jigsaw

and Whitebird contracts remained suspended until June 9, 2003. Stip. ¶¶ 9–10.[4] Scott Timber began to perform these contracts after the Forest Service sent notice that the suspensions were lifted and notified Scott that it should submit a new plan of operations. See, e.g., DX 41 at SCOTT–04316 (Letter from Woodard to Scott Timber (June 11, 2002)); DX 74 at SCOTT–09581 (Letter from Woodard to Scott Timber (June 9, 2003)); DX 93 at SCOTT–10291 (Letter from Woodard to Scott Timber (June 4, 2003)). By the time of trial, performance on the Pigout contract had been completed, and Scott Timber was completing work on the Jigsaw and Whitebird contracts. Tr. 1458:6–20 (Test. of Steven Nelson, the Forest Service official responsible for overseeing surveys on the three timber-sale areas).

Scott Timber filed three separate claims under the Contract Disputes Act with Ms. Woodard, the contracting officer, on November 9, 2004. Stip. ¶ 11. On April 25, 2005, Ms. Woodard issued decisions granting Scott Timber's claims in part and denying them in part. Compl. ¶ 23. She granted Scott Timber interest on its deposits on the three sales but denied Scott's claims for lost market opportunity and for other costs. Compl. ¶¶ 36, 53, 70.

### B. The ONRC Litigation

In 1998, several environmental organizations brought suit challenging the Forest Service's and the Bureau of Land Management's ("BLM") compliance with various "Category 2" survey requirements derived from the Northwest Forest Plan. See ONRC Action, 59 F.Supp.2d at 1091–92; Stip. ¶ 5. Plaintiffs in that case contended that the Forest Service and BLM had authorized various "timber sales without first conducting" the wildlife surveys required by the Northwest Forest Plan. Id. at 1087. An amended

complaint put at issue several timber sales which were identified with particularity. See id. at 1097.[5] The Jigsaw, Whitebird, and Pigout timber sales were not listed in the amended complaint. Id. However, these timber sales subsequently became relevant during settlement discussions among the parties. In response to the government's request for a settlement offer, see PX 53 at SCOTT–00026 (Draft of Letter from Edward Boling to Michael Axline (Aug. 8, 1998)),[6] the environmental organizations provided the Justice Department with lists of "at risk" timber sales that they believed "fail[ed] to comply with the Northwest Forest Plan, and ... would need to be withheld from award pending our negotiations." PX 55 at A–351 (Letter from Axline to Boling (Aug. 26, 1998)); see also PX 73 at A–427 (Settlement Offer from Boling to Axline (Oct. 26, 1998)); Tr. 197:6–18 (Boling). This list of at-risk sales included the Pigout timber sale, PX 55 at A–356 (Letter from Axline to Boling), and was later expanded to include the Jigsaw and Whitebird timber sales. PX 128 at A981 (Letter from Axline to Boling (July 6, 1999)).

One of the government's purposes in entering settlement discussions with the environmental plaintiffs was to avoid a temporary restraining order or preliminary injunction, and instead to reach "if not settlement[,] at least the orderly marshaling of the issues and [resolution of the case] through cross-motions for summary judgment." Tr. 197:19 to 198:6 (Boling); see PX 115 at SCOTT–00105 (Letter from Zike (April 5, 1999)) (reiterating the government's desire "to get the briefing done without the interruptions of TRO or PI"). From July 1998 to March 1999, the government sought to avoid any ... "interim actions or any awarding of any timber sales that would prompt a [p]reliminary [i]njunction motion" and ensure that neither the settlement discussions nor brief-

---

**4.** Unit 40 of the Whitebird Timber Sale Contract remained suspended after June 29, 2003 because the Forest Service had located an additional "red tree vole" nest that "needed to be protected." Stip. ¶ 10.

**5.** The amended complaint, filed after the court partially granted defendant's motion to dismiss, listed the Christy Basin, Beegum Corral Regan, Skull Thin, Gold Wind, North Murphy, Bear,

Class of '98, Sugar Pine, and Sweet Pea timber sales. ONRC Action, 59 F.Supp.2d at 1097.

**6.** The government had waived the attorney-client privilege and work-product protection for communications related to this case, see Blue Lake Forest Prods., Inc. v. United States, 75 Fed.Cl. 779 (2007), and thus communications that otherwise would have been privileged or protected were made available.

ing of cross-motions for summary judgment were interrupted by such a motion. Tr. 1336:16 to 1337:8 (Zike). Settlement discussions were eventually terminated without success, *see* PX 96 at A–519 (Letter from Boling to Zike (Dec. 4, 1998)), and the parties submitted cross-motions for summary judgment in the *ONRC Action* case in the spring of 1999. *See* PX 115 at A–752 (Letter from Zike) (enumerating the promises made by the government's counsel in convincing the environmental plaintiffs to agree to a briefing schedule).[7]

In internal discussions of the merits of the case, Lois Schiffer, then the Assistant Attorney General for the Environment and Natural Resources Division, was concerned about the weakness of the Forest Service's position to the point that she expressed the view that the Forest Service's interpretation of a key term relating to survey requirements was "nonsense." PX 91 at A–504 (Zike's handwritten notes of briefing with Boling and Schiffer (Nov. 25, 1998)); Tr. 134:23 to 135:20 (Boling), 474:23 to 475:21 (Zike). These concerns were shared by Peter Coppleman, the Deputy Assistant Attorney General. Tr. 117:15 to 118:8 (Boling). A record of decision prepared under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47, had required that surveys for five salamander species and a vole species, the "red tree vole," precede the design of all ground-disturbing activities that would be implemented on October 1, 1996 or later. *See ONRC Action,* 59 F.Supp.2d at 1091 & n. 3. Under the Northwest Forest Plan, surveys for other so-called Category 2 species had to be completed prior to ground-disturbing activities that would be implemented on October 1, 1998 or later. *Id.* at 1092. The Forest Service had equated a determination made under NEPA for a particular forest tract to ground-disturbing activities. *Id.* This interpretation became known as "NEPA decision equals implementation." *Id.* Owen Schmidt, who was the Forest Service's chief lawyer in *ONRC Action,* understood the Department of Justice to have some degree of "leeriness" regarding the validity of the Forest Service's interpretation. Tr. 1017:17–21 (Schmidt). The government's counsel nonetheless defended the Forest Service's interpretation of the survey requirements.

The district court for the Western District of Washington issued a decision on August 2, 1999 on the cross-motions for summary judgment, concluding that the Forest Service had failed to comply with the requirements outlined in the Northwest Forest Plan, and precluding the Forest Service from approving operations on the sales listed in the complaint until Category 2 surveys had been performed. *See ONRC Action,* 59 F.Supp.2d at 1093, 1097. The court rejected the Forest Service's interpretation of the effect of a NEPA determination for a particular tract and stated that any actions exempting timber sales based on this interpretation were "unlawful and must be set aside under the A[dministrative] P[rocedure] A[ct]." *Id.* at 1093–94.[8] Shortly thereafter, on August 26, 1999, the court expanded its injunction to encompass another twenty-five timber sale contracts, including the Jigsaw, Whitebird, and Pigout areas, none of which had been identified in the complaint. Stip. ¶ 6. Accordingly, on August 31, 1999, the Forest Service informed Scott Timber that it could not approve or proceed with operations on the timber sales at issue here. Stip. ¶ 7.

In November 1999, the parties to the *ONRC Action* entered into a stipulation in which the Forest Service agreed to continue

---

7. The government continued to express its desire for an orderly, non-emergency resolution of the case, as evidenced by Ms. Zike's statement that "DOJ ... wants to be assured that 'no dogs are let out in the street' while [Mr. Boling] is preparing our [m]otion for [s]ummary [j]udgment to the amended complaint and while the judge is considering the case, estimated to be May 15." PX 113A at TAB8–0184–85 (Letter from Zike to Devlin (March 19, 1999)); Tr. 1335:19 to 1337:8 (Zike).

8. After the court's rejection of the Forest Service's interpretation, in his memorandum recommending settlement of the decision in *ONRC Action,* Mr. Boling, the government's chief trial lawyer in the case, wrote that "our likelihood of success on appeal is not great because the agencies' interpretations are clearly in tension with the text of the [NEPA Record of Decision] and the common meaning of the words 'implement' and 'survey.'" PX 154 at 6–7 (Mem. for Schiffer from Boling (Nov. 18, 1999)).

the suspension of the enjoined timber-sale contracts "until [d]efendants have completed surveys and any species locations have been managed in accordance with . . . survey protocols and management requirements." PX 155 at A–1832 to A–1833 (Stipulation for Order Dismissing Action (Nov. 23, 1999)). In agreeing to this stipulation, the government gave the environmental plaintiffs in the *ONRC Action* case the right to seek administrative review of the Forest Service's surveys and to object to the sufficiency of those surveys prior to the resumption of any operations on the relevant contracts. *Id.* at A–1833 to A–1834. The government also agreed to pay the attorneys' fees and expenses of the environmental plaintiffs. *Id.* at A–1834. As a result of the stipulation, the *ONRC Action* lawsuit was voluntarily dismissed. *Id.* at A–1832.

During the course of the *ONRC Action* litigation, the Forest Service internally tracked the progress of the case very closely, and its staff was instructed to coordinate with the Justice Department before making any new timber sales during the course of the litigation. *See* PX 95 at A–516 (Letter from Zike to Forest Service distribution list) ("DOJ [Mr.] Boling requested today that the Forest Service give him a 5 day notice before awarding any of the sales listed by ONRC in their 9/17/98 letter."). There was both internal debate within the Forest Service and external consultation with the Justice Department about the course of the litigation and about the effects of making or delaying certain timber sales. *See, e.g.,* PX 110 at A–577 (E-mail from Brian Stone to Distribution List (Jan. 22, 1999)); PX 112 at 0223 (Mem. from Zike to Boling) (Feb. 2, 1999). The debate and consultations produced delay in awarding the Pigout, Whitebird, and Jigsaw timber-sale contracts to Scott Timber. *See, e.g.,* PX 113A at TAB 8 0184–85 (E-mail from Zike to Devlin) (Mar. 19, 1999). After some months of delay, in April 1999, Ms. Woodard notified Ms. Zike, who in turn notified the Justice Department, that the Forest Service "intend[ed] to award [Scott Timber's sales] as soon as possible, but not later than May 5, 1999." PX 118 at SCOTT–00110 (Letter from Woodard to Zike (Apr. 19, 1999)). The Justice Department responded that the For-est Service needed to abide by its earlier promise not to make these sales until mid-June, after the court's hearing on the parties' cross-motions for summary judgment. *See* PX 119 at SCOTT–00111 (Letter from Zike to Woodard (Apr. 23, 1999)). Ms. Zike wrote that she was "working with the Forest [Service] and [the] DOJ to assess the best strategic time to move ahead with the award of the sales," and that the Forest Service "appreciate[d] the need to give the DOJ [attorneys] the breathing space to put forth our best arguments." PX 120 at A–955 (Letter from Zike to Distribution List (May 19, 1999)). Ms. Zike stated that she "would like to suggest that we urge the quiet award of [Scott Timber's sales and others] after June 15." PX 121 at A–956 (E-mail from Zike (June 7, 1999)). After the hearing on the cross-motions, and after ONRC plaintiffs submitted their revised list of at-risk timber sales which included all three of Scott Timber's contracts, PX 128 at A–981 (Letter from Axline to Boling (July 6, 1999)), Ms. Zike wrote to various officials of the Forest Service that "we want to consider moving ahead with this sale[ ] and further sales," noting that Scott Timber's sales were "ready to award." PX 129 at A–984, A–987 (E-mail from Zike (July 7, 1999)).

Following these various consultations, Ms. Woodard, the contracting officer, had direct contact with Mr. Boling, the attorney at the Justice Department responsible for the defense in *ONRC Action*, on a conference call that also included Ms. Zike and other officials. *See* PX 139 at SCOTT–00125 (handwritten notes by Woodard (July 8, 1999)); Tr. 946:5–23 (Woodard). During this conference call, it was decided that the Forest Service would proceed with the award of the three contracts to Scott Timber, notwithstanding the pending *ONRC Action* litigation and the Justice Department's belief that the ONRC plaintiffs "will run to the court for a TRO/PI on these July sales." *See* PX 139 at SCOTT–00125 (handwritten notes by Woodard); PX 141 (Email from Zike (July 8, 1999)); Tr. 947:8 to 948:6 (Woodard).

### C. The Northwest Forest Plan

The origins of the Northwest Forest Plan can be traced back to a study undertaken by

the Forest Ecosystem Management Team ("FEMAT"), which was composed of representatives from the Forest Service, Bureau of Land Management, Environmental Protection Agency, and other federal agencies. *See* DX 2 at 2 (FEMAT Report (July 1999)). After a Forest Conference held by President Clinton in April 1993, FEMAT was given the task of "suggest[ing] the patterns of protection, investment, and use that will provide the greatest possible economic and social contributions from the nation's forests." *Id.* at 5 (FEMAT Report). It subsequently issued a report detailing various methods for allowing timber sales, which previously had been halted by environmental lawsuits, to proceed. *See id.* at 17–18 (FEMAT Report); Tr. 365:24 to 366:5 (Test. of Richard Holthausen, Forest Service wildlife ecologist).[9]

In April 1994, taking the FEMAT report and a related environment impact assessment as a foundation, *see* Tr. 369:21–24 (Holthausen), the Secretaries of the Department of Agriculture and Department of the Interior issued the Record of Decision ("ROD") for the Northwest Forest Plan. PX 3 (Record of Decision for Amendments to Forest Service and BLM Planning Documents Within Range of the Northern Spotted Owl (Apr.1994)) ("Record of Decision"). The Plan amended Land and Resource Management Plans governing the operation of nineteen National Forests and seven BLM districts in the Pacific Northwest, including the Umpqua National Forest where the tracts pertinent to Scott Timber's sales are located. *Id.* at 11–12. The Plan also established a formal interagency structure to coordinate activities relating to forest management, involving the Forest Service and BLM, and, additionally, the Fish and Wildlife Service, National Oceanic and Atmospheric Administration's National Marine Fisheries Service, the Environmental Protection Agency, the National

Park Service, the Bureau of Indian Affairs, the Soil Conservation Service, and various states and tribal organizations. *See id.* at E–16; Tr. 697:20 to 698:4 (Test of Thomas Hussey, a member of the Issue Resolution Team). To advise the regional heads of these federal agencies on "issues related to the Northwest Forest Plan and how it's implemented," the Plan established an interagency staff group called the Regional Ecosystem Office. Tr. 698:22 to 699:14 (Hussey).

To avoid causing harm to species in forest areas, the Northwest Forest Plan required various surveys to be performed before ground-disturbing activities were implemented. PX 3 at 11 (Record of Decision). These survey requirements were targeted towards the range and habitats of particular species. *See id.* at C–4. The NFP listed four categories or components of survey types, including (1) management of known species sites, (2) surveys for species at new sites prior to ground-disturbing activities, (3) extensive surveys to find high-priority sites for species management, and (4) general regional surveys. *See id.* at C–4 to C–6. With respect to the second category of surveys, known as the "Category 2" surveys—those at stake in the *ONRC Action* litigation—the Northwest Forest Plan stated that

> Efforts to design protocols and implement surveys should be started immediately. Where surveys are completed, the information gathered from them should be used to establish managed sites for species. Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, [Category 2] surveys for Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders, and red tree voles (and lynx, see page C–47), *must precede the design of all ground-disturbing*

9. The court in *ONRC Action* summarized the background to the FEMAT report:

> In 1991, following "a remarkable series of violations of the environmental laws," an injunction was entered in this district deferring further timber sales by the Forest Service until a lawful management plan was adopted. *Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081, 1089–96 (W.D.Wash.1991), *aff'd,* 952 F.2d 297 (9th Cir.1991). In a separate case,

> for similar reasons, the BLM was enjoined in the District of Oregon from making further timber sales in spotted owl habitat pending completion of an SEIS [supplemental environmental impact statement]. *See Portland Audubon Soc'y v. Lujan,* 795 F.Supp. 1489 (D.Or. 1992), *aff'd sub nom., Portland Audubon Soc'y v. Babbitt,* 998 F.2d 705 (9th Cir.1993).
> 59 F.Supp.2d at 1087.

*activities that will be implemented in 1997 or later.*

*Id.* at C–5 (emphasis added). The Plan also prescribed that survey protocols "for the other 71 species listed in Table–C–3 . . . must be completed prior to ground-disturbing activities that [would] be implemented in FY 1999 or later." *Id.*[10] During the *ONRC Action* litigation, the Forest Service had argued that it was not required to perform these "Category 2" surveys before approving the challenged timber sales, on the theory that there had already been a finding of no significant impact under NEPA, and thus that the ground-disturbing activities related to these timber sales had already been "implemented." *See ONRC Action,* 59 F.Supp.2d at 1092. Under this reasoning, so long as an environmental impact statement had been completed under NEPA before October 1, 1996, or before October 1, 1998, depending on when the Northwest Forest Plan required the surveys for particular species to be completed, the relevant timber sales would be exempted from the Category 2 survey requirements. *See id.* This interpretation of the effects of a NEPA finding was consistent with a past determination by the Forest Service and the BLM that a project would be deemed to be "implemented" when the "[NEPA] decision document is signed." Tr. 720:17 to 721:5 (Hussey); *see* PX 41 at A–279 (Joint BLM and Forest Service Mem. (Nov. 1, 1996)).[11]

The interpretation was described as a "very context sensitive" definition of "implementation" that would "only work[ ] for this particular set of language in the Northwest Forest Plan ROD." Tr. 756:23–25 (Hussey). There was internal debate within the agencies prior to the decision to settle on this interpretation of Category 2 survey requirements. *See, e.g.,* PX 38 at A–266 (Survey and Manage Component 2 Implementation Issues (Oct. 22, 1996)). During his trial testimony, Tom Hussey of the Forest Service described internal discussions about "the apparent contradictory nature of defining [this] decision point as being the definition of implementation in this context." Tr. 756:20–22 (Hussey). The agencies apparently recognized that this interpretation would be "a head scratcher to people that aren't deeply imbued in the context of the survey and manage requirement[s] of the Northwest Forest Plan," Tr. 757:1–11 (Hussey), given that "implementation" is normally associated with "physical activity on the ground." Tr. 749:13–24 (Hussey). In an earlier draft, the Forest Service had considered an alternative interpretation that implementation might occur after the NEPA decision but before the agency had made an irreversible commitment to act. *See* PX 24 at A–205 (Draft Implementation of Survey and Manage (Component 2) Requirements).

#### D. Post–Sale Surveys to Comply with the ONRC Action Decision

To comply with the decision in *ONRC Action* and the subsequent stipulation directing the Forest Service to complete surveys and properly manage species locations, the Forest Service was obligated to survey vascular plants, lichens, bryophytes, fungi, terrestrial mollusks, and red tree voles on, among other locations, the Pigout, Whitebird, and Jigsaw timber-sale areas. *See* PX 155 at A–1832 to A–1833 (Stipulation for Order Dismissing Action); DX 104 at SCOTT–00518 (Interim Report Status of Survey & Manage Species on Enjoined Sales Umpqua National Forest (Jan.2000)); PX 172 at 66 (Interrog. 20). Different surveys proceeded at different speeds and at different times of year. *See* Tr. 1466:23 to 1468:4 (Nelson). Protocols did not exist for surveying many Category 2 species under the Northwest Forest Plan; the Forest Service was thus obligated to develop protocols prior to performing these

---

10. These species included fungi, lichens, bryophytes, amphibians, mollusks, and vascular plants. *See* PX 3 at C–49 to C–61 (Record of Decision).

11. Separately, the agencies had issued a document entitled "Interim Guidance for Survey and Manage Component 2 Species; Red Tree Vole." *See* DX 109 at SCOTT–03288 (Field Service Mem. from Forest Service and BLM (Sept. 25, 1998)). This directive was used to exempt many traditional red tree vole habitats, including all of the red tree vole habitats on the Pigout, Whitebird, and Jigsaw timber-sale sales, from the Category 2 surveys. *See* PX 154 at 4 (Mem. for Schiffer from Boling), PX 172 at 39–40 (Interrog. 6).

surveys. *See* PX 3 at C–5 (Record of Decision). In addition, many of the surveyed species had seasonal attributes. Tr. 1467:1–17 (Nelson). Locating mollusks requires a certain amount of soil moisture and a certain range of soil temperature which are only present in the fall and the spring. Tr. 1467:1–10 (Nelson). Certain types of fungi are identifiable only at the times of year when they are bearing fruit, which can occur during different seasons for different types of fungi. Tr. 1467:14 to 1468:4 (Nelson). Furthermore, it would be difficult for just one survey team to survey terrain for all species—*e.g.,* fungi are located on the ground, but red tree voles are located in the forest canopy. Tr. 1436:2–19 (Nelson). And, when a potential red tree vole nest was sighted, a follow-up survey had to be performed to verify the actual presence of a nest; often, this required a second surveyor to climb the tree bearing the suspected red tree vole nest in its canopy. Tr. 1432:13 to 1433:14 (Nelson).

The Forest Service began to survey for the red tree vole, lichens, and bryophytes in mid-September 1999, and for the fungi and terrestrial mollusks in early November 1999. PX 172 at 66 (Interrog. 20). The lichen and bryophyte surveys were completed by October 13, 1999. *Id.* All fungi surveys were completed by July 10, 2000, and surveys of terrestrial mollusks were completed by November 7, 2000. *Id.* Surveys for the red tree vole took longer, in part because verification of possible red tree vole populations was required. *See* Tr. 1439:16 to 1440:4 (Nelson). The red tree vole surveys were ultimately completed by August 7, 2001. PX 172 at 66 (Interrog. 20).

### JURISDICTION

■ This court has subject matter jurisdiction under the Tucker Act "to render judgment upon any claim by or against ... a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 [, 41

U.S.C. § 609(a)(1) ]." 28 U.S.C. § 1491(a)(2). The Contract Disputes Act provides that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). After such a claim has been submitted, the aggrieved contractor will accrue the right to bring an action in this court where the contracting officer has either (i) rendered a final decision denying the relevant claim or (ii) failed to make a decision within the required time. 41 U.S.C. § 609(a)(1) (stating that a contractor may bring an action on a claim in this court following a decision by the contracting officer on that claim under 41 U.S.C. § 605); *see James M. Ellett Constr. Co., Inc. v. United States,* 93 F.3d 1537, 1541–42 (Fed.Cir.1996); *Metric Constr. Co. v. United States,* 81 Fed. Cl. 804, 817 (2008). Here, Scott Timber submitted separate claims regarding each of the Whitebird, Pigout, and Jigsaw timber-sale contracts to the contracting officer,[12] and the contracting officer issued three final decisions granting Scott Timber limited relief on, but otherwise denying, Scott's claims on those timber-sale contracts. *See* Compl. ¶¶ 22–23.[13] Because these were final decisions under the terms of the Contract Disputes Act, and because Scott Timber filed its complaint within twelve months of the contracting officer's final decisions, *see* 41 U.S.C. § 609(a)(3), this court has jurisdiction over Scott Timber's claims.

### STANDARDS FOR DECISION

■ In all contracts, each party owes a common law "covenant of good faith and fair dealing to its contracting partner." *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed.Cir.2005). This implied duty obligates parties to act "with good faith and fair dealing in [their] performance and in [their] enforcement" of the contract. Restatement (Second) of Contracts § 205 (1981). For instance, a party must refrain from doing any-

---

12. Scott's submissions to the contracting officer constituted a "claim" for purposes of the Contract Disputes Act because they involved (1) "a written demand or assertion," (2) "seeking as a matter of right," (3) "the payment of money in a sum certain." 48 C.F.R. § 52.233–1(c) (2002).

13. As noted *supra,* at 106, the contracting officer awarded Scott Timber interest on its deposits on the three sales but rejected all other claims.

thing "'that will hinder or delay the other party in performance of the contract'" or that will destroy the other party's reasonable expectations regarding the fruits of the contract. *Essex Electro Eng'rs v. Danzig,* 224 F.3d 1283, 1291 (Fed.Cir.2000) (quoting *Luria Bros. v. United States,* 177 Ct.Cl. 676, 369 F.2d 701, 708 (1966)); *Centex,* 395 F.3d at 1304. Such promises of cooperation and positive performance exist "in every [g]overnment contract, including timber sale contracts." *H.N. Wood Prods., Inc. v. United States,* 59 Fed.Cl. 479, 486 (2003). Any breach of these common law obligations that results in a constructive change in the contract can serve as the basis for a claim of delay or disruption which may entitle the aggrieved contractor to compensation from the government. *See Metric Constr.,* 81 Fed. Cl. at 817 (citing *Aydin Corp. v. Widnall,* 61 F.3d 1571, 1577 (Fed.Cir.1995); *Luria Bros.,* 369 F.2d at 708).

■■■ "In accordance with the Contract Disputes Act, 41 U.S.C. §§ 601–613, the interpretation of a contract is reviewed as a matter of law with no deference owing to the interpretation adopted by ... the agency." *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir.1997) (citing 41 U.S.C. § 609(b)). Where the United States is a party to the contract, this court applies general rules of contract interpretation, giving the terms of the contract "their customary and accepted meaning." *Scott Timber Co. v. United States,* 333 F.3d 1358, 1366 (Fed.Cir.2003) (citing *Alaska Lumber & Pulp v. Madigan,* 2 F.3d 389, 392 (Fed.Cir. 1993)).

## ANALYSIS

### I. EFFECT OF THE SUSPENSION CLAUSE

Contract provision CT6.01, which is contained within each of the Pigout, Whitebird, and Jigsaw contracts, expressly authorizes the Forest Service to suspend operations on these contracts under certain circumstances. *Scott Timber,* 333 F.3d at 1366 (interpreting an identical provision in another timber-sale contract). In accord with CT6.01, the government suspended these three contracts to

comply with the court order in *ONRC Action.* The government contends that in the aftermath of these contract suspensions, Scott Timber is limited in terms of the remedies it may seek, because the parties agreed to the liability provision in CT6.01, which defines the available remedies as, first, an extension of the contract term, and second, reimbursement of various out-of-pocket expenses. Def.'s Post–Trial Br. at 21 ("Def.'s Br."). Scott Timber responds that because CT6.01 does not explicitly exculpate the Forest Service from liability for conduct that caused the suspension of the contracts, it cannot serve to limit the Forest Service's liability in the manner suggested. Pl.'s Post–Trial Reply Br. at 1 ("Pl.'s Reply").

■■■ The government's contention is too broadly stated. Scott Timber correctly argues that if the government seeks to exculpate itself from liability on a breached contract, it must make its intent more directly known. *See Precision Pine & Timber, Inc. v. United States,* 50 Fed.Cl. 35, 58 (2001) (citing *Department of Natural Res. and Conservation of Mont. v. U.S.,* 1 Cl.Ct. 727, 734 (1983)). The suspension authority contained in CT6.01 does not remove all liability subject only to the limited relief allowed by the provision. As the Federal Circuit's decision in *Scott Timber* holds, the government's failure to comply with a legally binding obligation could engender a breach of contract notwithstanding the suspension authority set forth in CT6.01. 333 F.3d at 1368–71. The Forest Service's failure to comply with such an obligation could produce a suspension or continued suspension that was unreasonable and thus constitute a breach of the covenant of good faith and fair dealing or the closely related duties to cooperate and not hinder performance. *See Centex Corp.,* 395 F.3d at 1304–06; *see also Scott Timber,* 333 F.3d at 1368–69; John Cibinic, Jr., Ralph C. Nash, Jr., & James F. Nagle, *Administration of Government Contracts,* 458–59, 464–65 (4th ed. 2006) (*"Administration of Government Contracts"*).

Correspondingly, Scott Timber also goes too far when it suggests that the Forest Service's failure to include an explicit exculpatory provision in the contract, combined

with its failure to make timber available to Scott Timber as specified in the contract, amounts to a breach of contract "regardless of whether [the Forest Service] acted unreasonably." Pl.'s Post–Trial Brief at 9 ("Pl.'s Br."). Scott Timber's position overstates the strictness of the standard by which the Forest Service's actions are to be judged. In a similar case involving a claim that the Forest Service breached a timber-sale contract by using CT6.01 to suspend operations, the Board of Contract Appeals for the Department of Agriculture drew upon the Federal Circuit's *Scott Timber* decision to hold that if the government had been unreasonable in suspending or continuing the suspension of a contract, then it could "still be liable for breach notwithstanding its right to suspend under CT6.01." *Shawn Montee, Inc.*, AGBCA Nos. 2003–132–1 through 2003–136–1, 2004 WL 473250, at \*16 (Dep't Agric. B.C.A. Mar. 10, 2004) (citing *Scott Timber*, 333 F.3d at 1370–71). The board held that plaintiff, to establish a breach of contract, would have to demonstrate that the government acted sufficiently unreasonably so as to have breached its common law duty to cooperate and its obligation not to hinder performance. *Id.* at \*17. This court has similarly held that "the Forest Service's suspension authority was qualified by its implied obligations, including its duty to cooperate and not to hinder ... performance." *H.N. Wood Prods.*, 59 Fed. Cl. at 487.

## II. REASONABLENESS OF THE FOREST SERVICE'S ACTIONS

A determination whether the Forest Service's actions in suspending the contracts were "reasonable" involves a fact-intensive inquiry into the circumstances surrounding the award of the contracts, the *ONRC Action* litigation, and the suspensions and extensions of suspensions of Scott Timber's contracts. *See Scott Timber*, 333 F.3d at 1369 (describing the issue of reasonableness as "intensely factual"). In reviewing the suspension of the contracts in the proper context, this court will weigh the Forest Service's delay "relative to the circumstances surrounding why the suspension occurred and the degree of knowledge held by the Government at certain times." *Shawn Montee*, 2004 WL 473250, at \*22; *see also H.N. Wood Prods.*, 59 Fed.Cl. at 487 ("The Forest Service was not authorized to suspend H.N. Wood's [c]ontract indefinitely in order to comply with a court order if its own unreasonable or wrongful actions caused the court order to be imposed in the first place, or if it unreasonably delayed in remedying the offending circumstances.").

### A. Award of the Contracts in the Face of the ONRC Action Litigation

#### 1. The "NEPA decision equals implementation" interpretation of the Northwest Forest Plan.

The Forest Service contended during the *ONRC Action* litigation that a finding of no significant impact under NEPA marked the "implementation" of ground-disturbing activities for purposes of the Northwest Forest Plan. *See ONRC Action*, 59 F.Supp.2d at 1092. This position was the product of extensive debate within multiple task forces involving agency officials and scientists. *See* Tr. 695:4–15, 698:24 to 700:1, 701:3 to 703:18 (Hussey), 824:3 to 825:2 (Test. of Cheryl McCaffrey, a botanist for the Bureau of Land Management), 1059:11–18 (Devlin), 1591:6–13 (Test. of Lawrence Larsen, a member of the Issue Resolution Team). The Issue Resolution Team, a group composed of representatives from different government agencies working under the auspices of the Northwest Forest Plan, was given the task of developing interpretations of the Category 2 survey requirements. *See* Tr. 697:9–13, 697:18–22 (Hussey). Tom Hussey and Randy Hickenbottom of the Forest Service, together with Larry Larsen of BLM, Robin Brown from the Fish and Wildlife Service, and others, developed the interpretation later invoked during the *ONRC Action* litigation that a Category 2 survey would not be required for a timber sale if a finding of no significant impact had been made under NEPA prior to the relevant cutoff dates for species scheduled to be surveyed in FY 1997 and FY 1999. *See* PX 41 at A–279 (Joint BLM and Forest Service Mem.). The Forest Service relied upon this interpretation in deciding not to

perform Category 2 surveys on Scott's timber-sale areas, given that a positive NEPA decision had been made on these sales prior to October 1, 1998. Tr. 1452:16–20 (Nelson); *see* DX 49 at SCOTT–04726 (Analysis and Effects of Survey & Manage Results for the Pigout Timber Sale (Mar. 20, 2002)).

The Forest Service was aware of controversy surrounding this interpretation. As the government acknowledges in its post-trial brief, this definition of "implementation" was recognized by the Forest Service to be counterintuitive insofar as "the signing of a document does not literally result in moving any dirt." Def.'s Br. at 13 (citing Tr. 1407:19 to 1408:10, 1417:21 to 1418:15 (Test. of Nancy Graybeal, Deputy Regional Forester for Region 6, Forest Service)). The government additionally cites Mr. Hussey's explanation that "the [g]overnment frequently uses terminology in ways different from the common understanding of ordinary words, and when understood in the context of analyzing the NFP, this definition was logical." *Id.* (citing Tr. 757:1–11 (Hussey)). The tension underlying the supposed logic of this explanation is evidenced in the fact that exempting timber sales from surveys under the "NEPA decision equals implementation" interpretation would be inconsistent with the provisions of the Northwest Forest Plan to grandfather only areas where ground-disturbing activities had already occurred. *See* PX 27 at 2 (Survey and Manage: Current Implementation Issues (Aug. 26, 1996)) (stating that proceeding with unsurveyed timber sales "does not meet the intent of the R[ecord] O[f] D[ecision] for the Northwest Forest Plan]"); Tr. 1621:14 to 1623:6 (Larsen); *see also* Tr. 1598:20 to 1603:13 (Larsen) (stating that members of the Fish and Wildlife Service and BLM expressed concern about accelerating timber sales to avoid Category 2 surveys). Nevertheless, the Forest Service applied this interpretation to the survey due in FY 1997 and updated it to apply to the species to be surveyed in FY 1999. PX 60 at A–366 (Mem. from Forest Service and BLM addressing Implementation of Survey and Manage Component 2 and Protection Buffer Standards and Guidelines Regarding "Survey Prior to Ground–Disturbing Activities" (Sept. 11, 1998)); Tr. 1052:21–22, 1054:1–9 (Devlin).

The Forest Service was also aware of the attendant legal risks in using the "NEPA decision equals implementation" interpretation to award timber-sale contracts without performing Category 2 surveys. Members of the Forest Service and BLM were on notice that adopting the interpretation "NEPA decision equals implementation" could result in challenges by environmental groups to a number of timber-sale contracts. *See* PX 65 at A–373 to A–374 (Letter from Axline to Boling (Sept. 25, 1998)) (addressing arguments against "NEPA decision equals implementation"); PX 154 at 6 (Mem. for Schiffer and Coppleman from Boling (undated)) (describing the environmental plaintiffs' prior challenges to timber sales based upon "NEPA decision equals implementation"). Indeed, the Northwest Forest Plan was itself the product of litigation over the environmental aspects of timber sales. *See ONRC Action,* 59 F.Supp.2d at 1087; Tr. 283:14–24 (Test. of Michael Gippert, then Assistant General Counsel, National Resources Division, U.S. Department of Agriculture), 340:10–15 (Holthausen), 912:24 to 913:3 (Woodard). Plaintiffs similar to those in *ONRC Action* had mounted past challenges to timber contracts based upon concerns over protecting various threatened species including the spotted owl, the marbled murrelet, and others. *See, e.g., Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081 (W.D.Wash.1991), *Marbled Murrelet v. Pacific Lumber Co.,* 880 F.Supp. 1343 (N.D.Cal.1995); *see also* Tr. 1145:3–5 (Devlin).

### 2. Evolution of the ONRC Action proceedings.

The environmental plaintiffs in the *ONRC Action* litigation sought declaratory and injunctive relief based on their claims that the Forest Service and BLM had authorized various timber sales without first performing surveys of known sites of a number of potentially threatened species. *ONRC Action,* 59 F.Supp.2d at 1087. The plaintiffs challenged both the government's decision not to conduct red tree vole surveys and the government's use of the "NEPA decision equals implementation" conclusion to exempt numerous timber sales from the survey require-

ments. *Id.* at 1091–92, 1094–95. In their initial and amended complaints, plaintiffs put at issue nine timber-sale areas, namely, contracts on the Christy Basin, Beegum Corral Regan, Skull Thin, Gold Wind, North Murphy, Bear, Class of '98, Sugar Pine, and Sweet Pea timber sales. *See id.* at 1097.

As the litigation in the *ONRC Action* case proceeded, the Justice Department repeatedly expressed concern over the weakness of the Forest Service's position. The Assistant Attorney General for the Environment and Natural Resources Division stated in a briefing that the Forest Service's interpretation of "implementation" for purposes of Category 2 survey requirements was "nonsense." PX 91 at A–504 (Zike's handwritten notes of briefing with Boling and Schiffer (Nov. 25, 1998)). The government's chief trial lawyer later stated that the attempt to explain the reasonableness of the Forest Service's interpretation of "implementation" to the judge hearing the *ONRC Action* case "was not as clean and simple in retrospect as one would like." Tr. 135:9–14 (Boling). Nevertheless, the Justice Department defended the case on these grounds.

During settlement discussions, the environmental plaintiffs put forward an expanded list of timber-sale contracts that were deemed to be "at risk" or "problem" sales but which had not been named in their amended complaint. PX 55 at A–354 to A–356 (Letter from Axline to Boling (Aug. 26, 1998)); *see also* PX 73 at A–430 to A–432 (Settlement Offer from Boling to Axline (Oct. 26, 1998)); Tr. 197:11–20 (Boling). This list was eventually expanded to include the Pigout, Jigsaw, and Whitebird timber sales. PX 128 at A–981 (Letter from Axline to Boling (July 6, 1999)).

Neither Scott Timber nor any other bidder was made aware of this expanded list of contracts. Yet the government argues that Scott Timber had informal and formal notice that its sales were involved in litigation because, among other reasons, "environmental

litigation was a fact of life" for timber sales awarded in the Pacific Northwest, and the Forest Service had announced prior to oral auction that the Forest Service was involved in litigation that could potentially affect these contracts. Def.'s Br. at 34 (citing *Trinity River Lumber Co. v. United States*, 66 Fed. Cl. 98, 111 (2005); Tr. 870:14–871:17 (Woodard)). The contracting officer's announcement, made to prospective bidders at the opening of sealed bids and in advance oral bidding, stated in essence "that the sale is currently under litigation and [that the] award may be delayed." PX 71 at A–424 (E-mail from Devlin (Oct. 16, 1998)). This announcement was generic, and in its allusion to a possible delay, it cut in both directions— serving as a warning to bidders of the possibility of a delay in awarding the contracts, but also implying that any award made *after* a delay would be free from potential encumbrances relating to environmental litigation.[14] In all events, the announcement did not put Scott Timber on notice that its timber-sale contracts were directly affected by the *ONRC Action* litigation.

The government argues that Allyn Ford, the president of Scott Timber, "knew that the sales were involved in litigation" and "did nothing about it, choosing not to ask the Forest Service about the litigation, or make any kind of investigation." Def.'s Br. at 34 (citing Tr. 1535:24 to 1537:9 (Ford)). However, the evidence at trial does not support this contention. Mr. Ford's knowledge that the sales were involved in litigation was not any different from the generic knowledge acquired as a result of the announcement by Ms. Woodard's assistant at the oral auction. Prior to the order entered on August 26, 1999 in *ONRC Action* that expanded the list of enjoined timber sales beyond those identified in the environmental group's complaint, *see supra*, at 107–08, there was never any publicly known information that would link the three timber sales at issue here to the *ONRC Action* case.[15] Moreover, the record

---

**14.** A comparable argument made by the appellant in *Shawn Montee* posited that "bidders may have been lulled through the announcement into believing that there were no problems," given that the statement "only addressed delays in

award." *Shawn Montee,* 2004 WL 473250, at *20.

**15.** At trial, the government adduced testimony that the *ONRC Action* litigation was the subject

indicates that Scott Timber was, in fact, diligent in its inquiries: Peter Quast, Scott Timber's representative, contacted the Forest Service's contracting officer repeatedly over a series of months following the oral auction, seeking information about the status of Scott Timber's sales. *See, e.g.,* Tr. 904:16–24, 912:5 to 915:5, 935:17 to 937:12, 951:24 to 952:15 (Woodard). Among other things, "Scott Timber . . . would ask is this true that there's secret lists [of pending timber sales at risk]." Tr. 878:9–10 (Woodard). In these conversations, Scott Timber was never told that its timber-sale contracts were specific targets of the *ONRC Action* litigation. *See* Tr. 881:20–23 (Woodard). Indeed, Ms. Woodard testified that she believed she was obligated by the attorney-client privilege *not* to disclose that the environmental plaintiffs in the *ONRC Action* case had included the three projected sales on its listing of "at risk" sales. Tr. 880:16–25 (Woodard).

### 3. Consultations leading to these contract awards.

During the first half of 1999, the government and the environmental plaintiffs submitted briefs in support of their cross-motions for summary judgment in the *ONRC Action* litigation. During this period, the Forest Service was acutely cognizant that although Scott Timber's sales were not technically at risk in the *ONRC Action* litigation, they were sales as to which the Justice Department had agreed the environmental plaintiffs in *ONRC Action* would "receive prior notice of award according to the Stipulation to Establish a Briefing Schedule," submitted in the litigation. PX 119 at SCOTT–00111 (Mem. from Zike to Woodard (Apr. 23, 1999)); *see also* PX 121A at TAB 90973 (Sales Listed in '*ONRC Action*' Lawsuit That Are Ready to Award (June 16, 1999)) (listing

Scott Timber's three sales among a group of six such projected contracts).

On July 6, 1999, the plaintiffs in *ONRC Action* submitted a list of sales on which they wanted 10 days' notice prior to approval of a plan of operations. *See* PX 139 at SCOTT–00124 (Mem. from Zike (July 8, 1999)). Regions 5 and 6 of the Forest Service were "ready to award 7 sales and approve plan of operations on 1." *Id.* The message commented that the "draft Bartuska letter would appear to limit our ability to move forward with these sales until the court rules. However, given the history . . . of our willingness to delay (nearly a year) and the reticence of *ONRC Action* to get serious about naming sales in their lawsuit, we want to consider moving ahead with th[ese] and future sales, notwithstanding the draft Bartuska letter." *Id.*[16] Additionally, as the message advised, "[p]lease note that only 3 of the 'at-risk' sales proffered by *ONRC Action* were truly named in their Second Amended Complaint; the rest of the sales have been 'trading stock' over the past year but NOT before the court." *Id.*

During a conference call held on July 8, 1999, among Forest Service officials and the attorney with the Department of Justice representing the Service in the *ONRC Action* case, a decision was made to award the three timber sales to Scott Timber, along with one other sale to another bidder, PX 139 at SCOTT 1100125 (handwritten notes by Woodard); *see also* Tr. 527:14 to 528:9 (Zike), and the contracts were awarded on that same day, July 8, 1999. JX 6 at SCOTT–10876 (Jigsaw Timber Sale Contract); JX 7 at SCOTT–06387(Whitebird Timber Sale Contract); JX 8 at SCOTT–06387 (Pigout Timber Sale Contract); Tr. 929:16 to 932:15, 939:24 to 941:24 (Woodard). Scott Timber was not informed that its sales

---

of articles in *Forestry Forum*, a publication of the Northwest Forestry Association that Scott Timber's officials may well have seen in the course of their work. *See* Tr. 1537:10 to 1545:7, 1575:10 to 1584:23, 1659:11 to 1661:20 (Ford); *see also* DX 96 at 2 *(Forestry Forum Newsletter* (Sept. 11, 1998)); DX 97 at 4 *(Forestry Forum Newsletter* (Dec. 16, 1998)); DX 98 at 3 *(Forestry Forum Newsletter* (Mar. 19, 1999)). However, these articles never identified the three timber sales involved here with the *ONRC Action* case.

**16.** The reference to a "draft Bartuska letter" was to a draft of a letter by Ms. Ann Bartuska, then the head of timber management for the Forest Service in Washington, that apparently indicated that timber sales should not be awarded where the sales were being challenged in litigation. *See* Tr. 924:6 to 926:19 (Woodard).

were specifically targeted by the plaintiffs in *ONRC Action.* Tr. 877:25 to 881:23, 936:11 to 937:12 (Woodard).

Scott Timber proceeded with its initial steps to perform on the Whitebird, Jigsaw, and Pigout timber-sale contracts. According to Michael Bormuth, the timber cruiser and appraiser for Scott Timber, the timber from these three contracts represented approximately 10% of the 50–60 million board feet of timber that Scott's parent company, Roseburg Forest Products, normally acquired in a year for use in its mills. Tr. 662:5–19, 667:18 to 668:2 (Bormuth). The result of the Forest Service's suspension of Scott's contracts was a "shortfall in the raw materials [that] flow[ed] into the mills." Tr. 662:19–23 (Bormuth).

#### 4. *Synopsis.*

The facts of this case have led Scott Timber to make a superior-knowledge claim based on the principle that a government agency has an "implied affirmative duty 'to disclose superior knowledge that is required for the performance of a contract to which it is a party.'" Pl.'s Br. at 16 (quoting *Southern Calif. Edison v. United States,* 58 Fed. Cl. 313, 325 (2003)). Scott Timber argues that the government "knew that [Scott Timber's] sales were expressly at risk of being suspended . . . and . . . knew that . . . Scott lacked this information." Pl.'s Reply at 7. Scott Timber contends that the government, by not providing this specific information to Scott Timber, violated its "affirmative duty to provide bidders with all information in its possession that is pertinent to performance of the contract and not to mislead them." *Id.* at 9. Pertinent information, according to Scott Timber, included the fact that Scott Timber's sales "were on the 'at-risk' lists exchanged between the FS and *ONRC Action,*" and the Forest Service's agreement that environmental plaintiffs would not seek injunctive relief on Scott Timber's sales "so long as the F[orest] S[ervice] gave *ONRC Action* advance notice of any ground-disturbing activities on the sales." Pl.'s Br. at 16–17. Scott concludes that it suffered injury insofar as the Forest Service's failure to disclose this and other information led Scott

Timber to believe that "its operations would not be suspended" on the Pigout, Whitebird, and Jigsaw contracts, and thus led Scott Timber to accept these contracts with the Forest Service at a higher price than that it would otherwise have offered. *See id.* at 18.

Although Scott Timber pleads its case under the rubric of superior knowledge, its claims are more properly evaluated in terms of whether or not the Forest Service was reasonable in awarding contracts in the face of the *ONRC Action* litigation. *See Scott Timber,* 333 F.3d at 1369 (suspensions under a timber sale contract were subject to a rule of reasonableness); *H.N. Wood Prods.,* 59 Fed.Cl. at 487 (same). The government seeks to limit the scope of this reasonableness inquiry only to post-contract actions, citing the Federal Circuit's decision in *Scott Timber* for the principle that "the only potential breach the plaintiff could prove [regarding contracts which contain clause CT6.01] is a breach resulting from the duration of the suspension." Def.'s Br. at 26. The government interprets the Federal Circuit's decision in *Scott Timber* to stand for the fact that "any reasonableness inquiry is only appropriate as it relates to the duration of the suspensions, not the mere fact that the contracts were suspended." *Id.* (citing *Scott Timber,* 333 F.3d at 1368). The government argues that the implied covenant of good faith and fair dealing "arises only upon the formation of a contract" and "is limited to assuring compliance with the express terms of the contract." *Id.* at 22, 23 (citing *Bradley v. Chiron Corp.,* 136 F.3d 1317, 1326 (Fed.Cir. 1998)). The government concludes that it would be impossible for any breach of this covenant to have occurred before the contract was even awarded. *Id.* at 23, 26.

The government's arguments do not address whether a breach of the covenant of good faith and fair dealing could occur *as* the contract was awarded. In this respect, the court does not read the Federal Circuit's opinion in *Scott Timber* in the manner the government suggests. Although *Scott Timber* was, as plaintiff concedes, primarily about the reasonableness of "prolonging the duration of a suspension," Cl. Tr. 8:7–10, the Federal Circuit in that case did not decide

that actions prior to the contract award were not to be taken into account in assessing reasonableness. Instead, the court of appeals *did* take into account the Forest Service's pre-award actions and decisions in evaluating the reasonableness of contract suspensions initiated by the Forest Service. *See* 333 F.3d at 1368–70 (using the Forest Service's pre-award knowledge regarding murrelet habitats and the likelihood that the murrelet would be declared a "threatened species" as evidence of the unreasonableness of contract suspensions). In assessing reasonableness, the court of appeals observed that " '[i]t is a well-established principle of law that a party vested with contractual discretion must exercise his discretion reasonably.' " *Id.* at 1368 (quoting *Scott Timber v. United States,* 40 Fed.Cl. 492, 502 (1998)). Such an inquiry into the reasonable exercise of discretion can extend to actions that were performed prior to, or at, the contract award, and is not limited to an evaluation of the duration of the contract suspension. As a result, in evaluating the Forest Service's reasonableness, the court will consider circumstances surrounding the suspension of the contracts and the relative degrees of knowledge held by Scott Timber and the Forest Service prior to and at the award of the contracts. *See Shawn Montee,* 2004 WL 473250, at *17.

Here, the court finds that the pending litigation was not disclosed to Scott Timber by the Forest Service. The court also finds that Scott Timber suspected, but did not know, that "secret lists" of at-risk pending sales existed. Scott Timber was never able to confirm or dismiss that suspicion. All it had was a generic statement offered at the oral auction informing it of the possibility of a delay due to litigation over the sales. Tr. 870:14 to 871:17 (Woodard); PX 71 at A–424 (E-mail from Devlin (Oct. 16, 1998)). The specific risk relating to the *ONRC Action* litigation was never relayed. The Forest Service had ample knowledge of the substan-

tial risk it was taking in awarding the contracts to Scott Timber, reflecting both discussions its officials had with the Justice Department regarding the weakness of its "NEPA decision equals implementation" interpretation of Category 2 survey requirements and internal discussions regarding the environmental plaintiffs' likelihood of seeking and obtaining an injunction on Scott's sales.

■ Accordingly, the court finds that "relative to the circumstances surrounding why the suspension occurred and the degree of knowledge held by the Government at certain times," it was unreasonable for the Forest Service to have awarded these contracts to Scott Timber without informing Scott of the specific risks to its contracts from the *ONRC Action* litigation. *See Shawn Montee,* 2004 WL 473250, at *22.[17]

In addition, the Forest Service's unreasonable actions also amounted to a breach of its implied duty to cooperate. Scott Timber is not required to demonstrate that the Forest Service was acting with express malice or bad faith in this regard; rather, the Forest Service's violation of this duty can be inferred from its knowledge of certain risks, its failure to pass on this knowledge to its contracting partner, and the resulting deprivation to Scott Timber of a "substantial measure of the fruits of the contract." *See Centex Corp.,* 395 F.3d at 1304; *see also Administration of Government Contracts* at 464–65. Scott is entitled to damages based on the Forest Service's breach of this duty.

Scott Timber bid on these contracts with the Forest Service with the reasonable expectation that its operations would proceed in due course. Its repeated inquiries about the risks of litigation associated with these contracts demonstrated its concern. The result of the Forest Service's suspension of Scott Timber's contracts—a direct consequence of risks regarding the contracts of which the Forest Service was fully aware but Scott

---

**17.** The government argues that even in the event that this court finds that the Forest Service breached its duty of good faith and fair dealing, Scott Timber is unable to offer sufficient proof to overcome the presumption that the Forest Service's officials were acting in good faith while discharging their duties. Def.'s Br. at 26–27.

However, "clear and convincing" evidence here establishes that the Forest Service had detailed notice of the risks it was taking in awarding the timber-sale contracts to Scott Timber. *See Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir.2002).

Timber was not—was a "shortfall in the raw materials [that] flow[ed] into the mills." Tr. 662:19–23 (Bormuth). The Forest Service is accordingly liable for damages respecting this timber shortfall. At trial, Mr. Bormuth stated that the timber shortfall was equal to approximately 5–6 million board feet of timber; Tr. 662:5–19, 667:18 to 668:2 (Bormuth), but the details about that shortfall and Scott Timber's lost opportunities are matters to be addressed more specifically in the damages phase of this bifurcated case.

## B. Extended Suspensions

Each of Scott Timber's three contracts were suspended on August 31, 1999 as a result of the *ONRC Action* litigation. Stip. ¶ 7. The suspension of the Pigout contract lasted until June 11, 2002, Stip. ¶ 8, and the suspensions on the Jigsaw and Whitebird contracts lasted until June 9, 2003. Stip. ¶¶ 9–10. These suspensions were extended by delays in survey work and by extraneous events. Scott Timber contends that the extended suspensions were unreasonable wholly apart from the unreasonableness or not of the award of contracts in the face of the *ONRC Action* litigation. Pl.'s Br. at 36–40.

When the Northwest Forest Plan was instituted, no particular survey protocols had yet been established for the Category 2 species. Tr. 1117:3–6 (Devlin). As a result, to begin performing the necessary surveys on Scott Timber's timber-sale areas, the Forest Service had to develop survey protocols,[18] understand what those survey protocols would entail, identify and train the employees who would work on the survey crews, and put the crews into the forest at the appropriate time of the year to identify the

various Category 2 species. Tr. 1462:11 to 1464:15, 1464:20 to 1466:3, 1466:23 to 1468:4 (Nelson). In addition, the Forest Service would prepare reports discussing "the results of [its] survey[s], what species were found, and what management requirements might be required because of the species that were found." Tr. 1476:4–7 (Nelson); *see, e.g.,* DX 104 at SCOTT–00518 (Interim Report Status of Survey & Manage Species on Enjoined Sales Umpqua National Forest (Jan.2000)). Under the *ONRC Action* settlement agreement, all of Scott's sales were subject to the requirement that the Forest Service report the results of these surveys to the environmental plaintiffs, who could then object to the sufficiency of the surveys prior to the resumption of operations. Tr. 1475:3–10 (Nelson); PX 155 at A–1833 to A–1834 (Stipulation for Order Dismissing Action).

The Forest Service began to survey the Category 2 species on the Jigsaw, Whitebird, and Pigout timber-sale areas in the autumn of 1999. PX 172 at 66 (Interrog. 20). It completed the fungi surveys in July 2000, the terrestrial mollusk surveys in November 2000, and the red tree vole surveys in August 2001. *Id.;* Tr. 1447:8 to 1448:11 (Nelson). These completion dates were later than expected, given that the Forest Service (i) had planned to complete fungi surveys following the ground thaw in the spring of 2000, DX 104 at SCOTT–00520 (Status Report of Survey & Manage Species on Enjoined Sales Umpqua National Forest), (ii) could reasonably have completed the terrestrial mollusk surveys by the same time, *see* Tr. 1467:1–10 (Nelson), and (iii) could reasonably have completed the red tree vole surveys by the end of the fall of 1999.[19]

---

18. Survey protocols for bryophytes were made available on December 11, 1997. DX 105 at SCOTT–03099 (Survey Protocols For Survey and Manage Component 2: Bryophytes (Dec. 11, 1997)). Survey protocols for lichen were made available on March 12, 1998. DX 106 at SCOTT–03128 (Survey Protocols for Component 2: Lichens (Mar. 12, 1998)). Survey protocols for mollusks were made available on August 31, 1998. DX 107 at SCOTT–03206 (Survey and Manage Survey Protocols–Mollusks (Aug. 31, 1998)). The protocol for the red tree vole was made available on November 4, 1996, and renewed on September 25, 1998. DX 109 at SCOTT–03288 (Extension of Draft Interim Guid-

ance For Survey and Manage Component 2 Species Red Tree Vole (Sept. 25, 1998)).

19. It took approximately one day for a survey crew to survey one cutting unit within a timber-sale area. Tr. 1433:15–20 (Nelson). Surveys for the red tree vole were more complicated because a subsequent verification of suspected red tree vole nests would occur "a couple of weeks" after the initial survey. Tr. 1434:21 to 1435:1 (Nelson). Suspected nests in the tree canopy were identified by a ground survey, and verification by climbing trees was necessary thereafter. Thus, given that the Forest Service began the red tree vole surveys on September 22, 1999, PX 172 at

██ The government claims that the suspensions of these contracts could not have been lifted even after the late completion dates for these surveys, due to "another environmental lawsuit brought by Umpqua Watersheds, challenging the Warm Springs Environmental Assessment that included both the Jigsaw and Whitebird contracts." Def.'s Br. at 38 (referring to *Umpqua Watersheds v. United States Forest Service*, No. 01–399 (D.Or. Apr. 2, 2002)). However, no injunctive order was ever issued in the *Umpqua Watersheds* litigation, Tr. 1496:2–4 (Nelson), and thus the government did not have the necessary authority under CT6.01 to continue the suspensions of the contracts on this ground. CT6.01 specifies that operations may be interrupted or delayed "[t]o comply with a court order, issued by a court of competent jurisdiction." *See supra*, at 105. The lack of a court order eliminates any reasonable contractual basis for extending the suspensions at issue here, and renders the Forest Service liable for breach of contract due to its actions in unreasonably delaying the suspensions.

Furthermore, the Forest Service unreasonably incurred a significant delay by deciding to continue the suspension for the entire Pigout timber-sale area despite the fact that only one unit within that area, containing a potential red tree vole nest, remained to be surveyed after 2000. *See* Tr. 1457:9–22 (Nelson); DX 130 at SCOTT–04598 (Red Tree Vole Survey Description and Summary Data Form). When faced with a similar suspected red tree vole nest on the Whitebird timber-sale area, the Forest Service suspended operations within a five-acre radius of that nest but allowed operations to resume on all other units within the timber-sale area. Stip. ¶ 10. The Forest Service was unreasonable in failing to confine the Pigout suspension in a similar manner.

Accordingly, the court finds that the Forest Service unreasonably extended these suspensions past the spring of 2000 and is liable for the damages caused by Scott Timber's inability to operate on these timber-sale areas between the spring of 2000 and the dates the suspensions were lifted.

## C. A Sufficient Showing of Damages to Establish Liability

Finally, the government resists Scott Timber's claim that it would make use of timber from the three contracts within the original contract term, citing evidence at trial which the government contends "showed that Scott had waited over five years to complete the Pigout contract, and had not yet completed harvest on the Jigsaw and Whitebird contracts." Def.'s Br. at 26 (citing DX 41, 74, 93; Tr. 1458:6–20 (Nelson)). On this basis, the government concludes that Scott Timber has failed to demonstrate that it was damaged by the duration of the suspensions. However, the claim letters submitted by Scott Timber under the Contract Disputes Act negate the government's contention because they provide detailed plans regarding timber harvesting on the three contracts and describe detailed damages suffered by Scott Timber as a result of the suspensions. *See, e.g.*, Stip. ¶ 11; JX 9 (Certified Claim relating to Jigsaw Timber Sale Contract (Nov. 9, 2004)); JX 10 (Certified Claim relating to Pigout Timber Sale Contract (Nov. 9, 2004)). These proofs are sufficient evidence to "demonstrate that the issue of liability is not purely academic." *Cosmo Constr. Co. v. United States*, 196 Ct.Cl. 463, 451 F.2d 602, 606 (1971).

## CONCLUSION

As explained, the evidence at trial established that the Forest Service entered into the timber-sale contracts with Scott Timber for the Jigsaw, Whitebird, and Pigout timber areas in the face of a very substantial risk, indeed, a likelihood, that the sales would be enjoined by judicial action in a pending lawsuit brought by environmental groups chal-

---

66 (Interrog. 20), all 27 units in the three sales could have been surveyed, and the two potential nests found in Unit 10 of Pigout and Unit 40 of Whitebird could have been verified, by the end of November 1999. However, the Forest Service waited until August 8, 2001 to verify the potential

red tree vole nest in Unit 10 of the Pigout timber-sale area. Tr. 1457:9–22 (Nelson); DX 130 at SCOTT–04598 (Red Tree Vole Survey Area Description and Summary Data Form (Sept. 25, 1999)).

lenging such sales. At the time of the sales, the Forest Service knew of the shaky legal grounds for its position that "NEPA decision equals implementation" of ground-disturbing activities and its grandfathering of sales from surveys of so-called Category 2 species under the National Forest Plan. The Forest Service also knew that a judicial decision in the litigation was likely to be rendered relatively soon. Scott Timber did not have the knowledge that the timber sales were being put at issue in the litigation and thus could not anticipate, or judge the likelihood of, an injunction against the pending timber sales. The resulting injunction and ensuing suspension accordingly were unreasonable, and the Forest Service's actions were not protected against liability by the suspensions section of the timber-sales contracts. In addition, after the suspensions were entered, the Forest Service unreasonably and unduly delayed the suspensions by not completing its species-survey work in timely fashion and by continuing two of the suspensions based upon litigation in which no injunction was ever entered. Thus, Scott Timber has established the government's liability for breach of contract in this case, on two alternative and independent grounds.

Preparatory steps for a trial on damages shall be undertaken. In accord with Appendix A to the Rules of the Court of Federal Claims, ¶¶ 11 and 12, the parties are directed to file a joint status report by April 3, 2009, addressing the items listed in ¶ 12 (last sentence) with respect to trial on damages. That report should address any supplemental discovery that the parties propose be conducted to complete a foundation for a trial on damages.

IT IS SO ORDERED.